1  SCOTT A. EDELMAN, SBN 116927
      sedelman@gibsondunn.com
2  ILISSA SAMPLIN, SBN 314018
      isamplin@gibsondunn.com
3  GIBSON, DUNN & CRUTCHER LLP
   2029 Century Park East, Suite 4000
4  Los Angeles, CA  90067-3026
   Telephone: 310.552.8500
5  Facsimile:  310.551.8741

6  GABRIELLE LEVIN (*pro hac vice*)
      glevin@gibsondunn.com
7  GIBSON, DUNN & CRUTCHER LLP
   200 Park Avenue
8  New York, NY  10166-0193
   Telephone: 212.351.4000
9  Facsimile:  212.351.4035

10  Attorneys for Defendant APPLE INC.

11                  UNITED STATES DISTRICT COURT

12               NORTHERN DISTRICT OF CALIFORNIA

13

14  SA MUSIC, LLC, et al.,              CASE NO. 2:20-cv-02146-WHO
                                        CASE NO. 2:20-cv-02794-WHO
15            Plaintiffs,               CASE NO. 2:20-cv-02965-WHO

16       v.
                                        **DEFENDANT APPLE INC.'S NOTICE OF**
17  APPLE INC., et al.,                 **MOTION AND MOTION FOR PARTIAL**
                                        **SUMMARY JUDGMENT**
18            Defendants.
                                        **Hearing:**
19                                      Date:       January 26, 2022
                                        Time:       2:00 p.m.
20                                      Judge:      Hon. William H. Orrick

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOTICE IS HEREBY GIVEN that on January 26, 2022, at 2:00 p.m., or as soon thereafter as this matter may be heard, in Courtroom 2 of the above titled Court, located at 450 Golden Gate Avenue, San Francisco, California, Defendant Apple Inc. ("Apple") will and hereby does move for partial summary judgment with respect to the claims of Plaintiffs SA Music LLC, William Kolbert, as Trustee of The Harold Arlen Trust, Ray Henderson Music Co. Inc., and Four Jays Music Company (hereinafter collectively, "Plaintiffs")[1] against Apple for copyright infringement, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.

Apple seeks an order pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56 dismissing with prejudice Plaintiffs' claims for willful copyright infringement, Plaintiffs' copyright infringement claims based on promotional clips, and Plaintiffs' copyright infringement claims based on a making available theory of liability.

No Willful Copyright Infringement.  No reasonable jury could find that that Apple *willfully* infringed Plaintiffs' purported copyrights in the musical compositions at issue in these cases (the "Subject Compositions").  Apple had no knowledge of the alleged infringement until Plaintiffs filed these lawsuits because Plaintiffs did not notify Apple at any time before filing that they believed sound recordings embodying the Subject Compositions without authorization were being sold in the iTunes Store.  Moreover, the content providers who supplied the sound recordings to Apple contractually represented and warranted that they had all necessary authorizations for the sound recordings, including for the underlying musical compositions, and therefore Apple had no reason to believe the recordings or musical compositions were unauthorized.  And as a general matter, Apple is not willfully blind to copyright infringement in the iTunes Store.  To the contrary, it has a notice-and-takedown procedure that allows it to quickly respond to allegations of copyright infringement—a procedure Plaintiffs declined to follow in connection with the works at issue in these cases, choosing to file suit instead.

No Copyright Infringement Based on Promotional Clips.  As for their claims of copyright

---

[1]  By stipulation between the parties dated August 13, 2021, Julia Riva is no longer a Plaintiff in these cases.  No. 2:20-cv-02794-WHO, Dkt. 94; No. 2:20-cv-02146-WHO, Dkt. 91; No. 2:20-cv-02965-WHO, Dkt. 83.  By the same stipulation, William Kolbert is no longer a Plaintiff in the *Genepool* case.  No. 2:20-cv-02965-WHO, Dkt. 83.

Gibson, Dunn &
Crutcher LLP

infringement based on Apple's alleged streaming of promotional clips of the sound recordings at issue, Plaintiffs have produced no evidence that *any* of the Subject Compositions were ever streamed as promotional clips in the iTunes Store.   Plaintiffs cannot survive summary judgment on their promotional clip theory of copyright infringement without any evidence of the allegedly infringing promotional clips.  *See, e.g.*, *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1318-20 (9th Cir. 1986).

No Copyright Infringement Based on a Making Available Theory.  Plaintiffs' claims that Apple infringed their exclusive distribution rights by making certain sound recordings embodying the Subject Compositions "available" in the iTunes Store are not cognizable under Section 106(3) of the Copyright Act.  "Distribution" requires "actual dissemination" of a copy, and merely making a copyrighted work "available" for sale does not constitute actual dissemination or distribution.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007).  Plaintiffs' claims of infringement based on sound recordings that were made available for sale in the iTunes Store, but never actually sold, therefore should be dismissed with prejudice.

The Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Ilissa Samplin, and the Declaration of Erin Cook, filed concurrently herewith, and on all pleadings and papers on file in these actions, and upon such other evidence and arguments as the Court may entertain at the time of the hearing on this Motion.


Dated: November 23, 2021

GIBSON, DUNN & CRUTCHER LLP


By:   /s/ *Scott A. Edelman*
                    Scott A. Edelman
                    Gabrielle Levin
                    Ilissa Samplin


Attorneys for Defendant APPLE INC.

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................ 1

II. STATEMENT OF ISSUES TO BE DECIDED (L.R. 7-4(A)(3)) ................................. 3

III. FACTUAL BACKGROUND ...................................................................................... 3

    A.    Apple Launched The iTunes Store To Combat Music Piracy Over The Internet......... 3

    B.    Digital Downloads Of Sound Recordings Implicate Two Copyrights......................... 4

    C.    Plaintiffs Assert Copyright Infringement Solely With Respect To The Musical Compositions Allegedly Embodied In The Sound Recordings At Issue ..................... 4

    D.    The Three Lawsuits At Issue........................................................................................ 6

        1.    The *Adasam* Case (No. 20-cv-2146) ............................................................... 6

        2.    The *Pickwick* Case (No. 20-cv-2497) ............................................................ 7

        3.    The *Genepool* Case (No. 20-cv-02965) ........................................................ 7

    E.    The Content Providers Completed Apple's Application Process ............................... 8

    F.    The Content Providers Contractually Guaranteed Apple That The Subject Compositions Were Properly Licensed........................................................................ 9

    G.    Apple's Contracts With Content Providers Are Industry Standard By Necessity...... 10

    H.    Apple Maintains A Robust "Notice And Takedown" Program To Remove Any Content About Which It Receives Allegations Of Infringement ............................... 11

    I.    Apple Had No Reason To Suspect The Subject Compositions Were Unauthorized ................................................................................................................ 13

    J.    Plaintiffs Declined To Use Apple's Notice And Takedown System ......................... 14

IV. PROCEDURAL BACKGROUND.............................................................................. 16

    A.    Plaintiffs' Original Lawsuit ....................................................................................... 16

    B.    The Court Consolidates Summary Judgment Briefing In These Cases ..................... 17

V. LEGAL STANDARD................................................................................................... 18

VI. ARGUMENT ............................................................................................................. 19

    A.    None Of Apple's Alleged Infringement Was Willful ................................................ 19

        1.    Apple Did Not Have Actual Knowledge Of The Alleged Infringement ........ 19

        2.    Apple Did Not Recklessly Disregard And Was Not Willfully Blind To The Alleged Infringement .............................................................................. 20

Gibson, Dunn &
Crutcher LLP

**TABLE OF CONTENTS**
(continued)

Page

       a.    Apple's Good Faith Reliance On Its Contracts With The Content Providers Dooms Plaintiffs' Willfulness Allegations ........... 21

       b.    Apple's Notice And Takedown Procedure Further Establishes That Apple Was Not Willfully Blind To The Alleged Infringement ...................................................................................... 26

       c.    Apple's Notice And Takedown System Is Not Evidence Of Willfulness ........................................................................................ 27

B.    Plaintiffs' Infringement Claims Based On Alleged Promotional Clips And A "Making Available" Theory Of Liability Fail ............................................................ 31

    1.    The Court Should Grant Apple Summary Judgment on Plaintiffs' Infringement Claims Based On Alleged Promotional Streams...................... 32

    2.    The Court Should Grant Apple Summary Judgment On Plaintiffs' Infringement Claims Based On A Rejected "Making Available" Theory of Liability............................................................................................ 33

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

CASES                                                                                                      Page(s)

*Adams v. Agrusa*,
   2016 WL 7665410 (C.D. Cal. July 1, 2016) ................................................................22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...............................................................................................18, 33

*Applied Bus. Software, Inc. v. Citadel Serv. Corp.*,
   2019 WL 1949455 (C.D. Cal. Mar. 26, 2019) ......................................................18, 31

*Atari Interactive, Inc. v. Redbubble, Inc.*,
   515 F. Supp. 3d 1089 (N.D. Cal. Jan. 28, 2021) ..................................................20, 27

*Atl. Recording Corp. v. Howell*,
   554 F. Supp. 2d 976 (D. Ariz. 2008) .......................................................................35

*Berkla v. Corel Corp.*,
   66 F. Supp. 2d 1129 (E.D. Cal. 1999) .....................................................................32

*Bhan v. NME Hosps., Inc.*,
   929 F.2d 1404 (9th Cir. 1991) .................................................................................18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................................................................18

*Dallas Buyers Club, LLC v. Doughty*,
   2016 WL 1690090 (D. Or. Apr. 27, 2016) .............................................................28

*Danjaq LLC v. Sony Corp.*,
   263 F.3d 942 (9th Cir. 2001) ..............................................................................20, 24

*Davis v. Pinterest, Inc.*,
   2021 WL 879798 (N.D. Cal. Mar. 9, 2021) ...........................................................29

*Erickson Prods., Inc. v. Kast*,
   921 F.3d 822 (9th Cir. 2019) ..........................................................................19, 21, 25

*Evergreen Safety Council v. RSA Network Inc.*,
   697 F.3d 1221 (9th Cir. 2012) .................................................................................21

*EVOX Prods., LLC v. Verizon Media Inc.*,
   2021 WL 3260609 (C.D. Cal. May 5, 2021) ...........................................................34

*Fahmy v. Jay Z*,
   2015 WL 5680299 (C.D. Cal. Sept. 24, 2015) .......................................................22

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991) .................................................................................................31

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**TABLE OF AUTHORITIES (continued)**

Page(s)

*Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*,
772 F.2d 505 (9th Cir. 1985)..................................................................................21, 22

*Frerck v. Pearson Educ., Inc.*,
63 F. Supp. 3d 882 (N.D. Ill. 2014) ...............................................................................18

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) .......................................................................................................21

*King Records, Inc. v. Bennet*,
438 F. Supp. 2d 812 (M.D. Tenn. 2006) .........................................................................25

*Luvdarts, LLC v. AT & T Mobility, LLC*,
710 F.3d 1068 (9th Cir. 2013)..................................................................................19, 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .......................................................................................................18

*Nakada + Assocs., Inc. v. City of El Monte*,
2017 WL 2469977 (C.D. Cal. June 2, 2017) ..................................................................32

*In re Napster, Inc. Copyright Litig.*,
377 F. Supp. 2d 796 (N.D. Cal. 2005) ...........................................................................34

*Nat'l Car Rental Sys., Inc. v. Comput. Assocs. Int'l, Inc.*,
991 F.2d 426 (8th Cir. 1993)..........................................................................................34

*In re Oracle Corp. Secs. Litig.*,
627 F.3d 376 (9th Cir. 2010) ..........................................................................................18

*Orr v. Bank of Am., NT & SA*,
285 F.3d 764 (9th Cir. 2002)..........................................................................................28

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007).................................................................................34, 35

*Perfect 10, Inc. v. Giganews, Inc.*,
2014 WL 12597433 (C.D. Cal. Oct. 31, 2014).........................................................28, 29

*Richardson v. CBS Studios Inc.*,
2013 WL 12120265 (C.D. Cal. Sept. 25, 2013).........................................................32, 33

*SA Music v. Amazon*,
2020 WL 3128534 (W.D. Wash. June 12, 2020).......................................................31, 35

*Seiler v. Lucasfilm, Ltd.*,
808 F.2d 1316 (9th Cir. 1986).........................................................................................32

*Taylor Holland LLC v. MVMT Watches, Inc.*,
2016 WL 6892097 (C.D. Cal. Aug. 11, 2016) ................................................................19

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**TABLE OF AUTHORITIES (continued)**

Page(s)

*Taylor v. List*,
    880 F.2d 1040 (9th Cir. 1989) ........................................................................................18

*United Fabrics Int'l, Inc. v. J. C. Penney Corp.*,
    2009 WL 10674938 (C.D. Cal. Apr. 10, 2009) ........................................................19, 20

*Ventura Content, Ltd. v. Motherless, Inc.*,
    2013 WL 11237204 (C.D. Cal. July 3, 2013) ...........................................................27, 30

*VHT. Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019)................................................19, 23, 25, 26, 27, 29, 34, 35

**STATUTES**

17 U.S.C. § 106 ..................................................................................................................34

17 U.S.C. § 115 ..................................................................................................................26

17 U.S.C. § 504 ..................................................................................................................19

**OTHER AUTHORITIES**

2 Melville B. Nimmer, *Nimmer on Copyright* § 8.11[A] (1993) .........................................34

**RULES**

Fed. R. Civ. P. 56(a)...........................................................................................................18

Fed. R. Evid. 404 ...............................................................................................................28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

In the early 2000s, bootleg file-sharing services "were causing havoc in the music industry" by allowing users to share music across the Internet without paying copyright holders.  Ex. 1 at 1.[2] Grokster, Napster, and a host of peer-to-peer networks made copyrighted music available for free, and the music industry was on the verge of collapse.  Steve Jobs had the vision for a "revolutionary online music store" to solve this "seemingly unstoppable" problem.  Ex. 2.  By betting that people would pay for music if it was legal, cheap, and easy, Apple began offering music for sale in its iTunes Store— taking control back from Napster and other bootleg file-sharing services, and ensuring that the rights of copyright holders were respected.  *Id.*  Apple's iTunes Store, launched in 2003, saved the music industry from rampant copyright infringement over the Internet by "creat[ing] a commercial superhighway" between artists and consumers, providing a means for artists to get paid for digital versions of their music and protecting their rights as copyright holders.  Ex. 3.  The iTunes Store has become a staple in the music industry, lauded for allowing artists to impart value *and* reap the benefit of their work.  Since its launch, more than ███████ sound recordings have been uploaded to the iTunes Store.  Ex. 4 ¶ 34.

Oblivious to Apple's pivotal role in combating music piracy, Plaintiffs baldly claim Apple is engaged in *willful* copyright infringement in the iTunes Store.  Plaintiffs—the purported owners of copyrights in the 103 musical compositions at issue in these cases—allege Apple willfully infringed their copyrights by offering for sale in the iTunes Store 1,206 "pirated" sound recordings supplied to Apple by third parties that embody those 103 compositions.  These sound recordings—approximately ███████ of the total number of sound recordings ever uploaded to the iTunes Store—have generated no more than $6,797 in sales combined over 13 years.

While not moving for summary judgment on the issue of infringement, Apple strongly disputes any liability for infringement of the musical compositions Plaintiffs allege are embodied in the sound recordings at issue.  *Numerous* genuine issues of material fact exist as to whether the copyrights at

---

[2]  All "Ex." references are to the Declaration of Ilissa Samplin ("Samplin Decl.") in support of this Motion, filed concurrently herewith.

Gibson, Dunn &
Crutcher LLP

issue are valid, whether Plaintiffs own them, whether certain of Plaintiffs' infringement claims are time-barred, and whether Apple can be held directly liable for the alleged infringement at all. Those are issues Apple is confident a jury will resolve in its favor at trial.

But what is certain at this juncture and appropriate for summary adjudication is that *no reasonable jury could find that Apple's alleged infringement in these cases was willful.* Plaintiffs' request for millions of dollars in enhanced damages under the Copyright Act for "willful" infringement—arising from a mere $6,797 worth of sales over 14 years—should be rejected now: the undisputed evidence shows that Apple did not actually know of, and was not willfully blind to, the particular acts of infringement alleged in these cases.

Specifically, it is undisputed that:

- Plaintiffs *did not put Apple on notice* of the alleged infringement before they filed these cases;

- Apple *promptly removed the allegedly infringing content* after these lawsuits were filed;

- The content providers that supplied the allegedly infringing content *granted Apple licenses* to exploit the content;

- The content providers *contractually guaranteed* Apple that they had secured all licenses necessary for Apple to exploit the content;

- Apple *reasonably relied* on those contractual guarantees; and

- Apple put in place a robust *notice and takedown procedure* for removing potentially infringing content from the iTunes Store long before the alleged infringement in these cases.

These undisputed facts mandate summary adjudication in Apple's favor on the issue of willfulness. Had Plaintiffs simply notified Apple of the alleged infringement through Apple's notice and takedown procedure, the allegedly unauthorized sound recordings would have been removed from the iTunes Store years ago. Plaintiffs instead chose to file these lawsuits in the hopes of securing a windfall of millions of dollars in statutory damages based on sound recordings that generated less than $7,000 in sales, and assert bald claims that piracy runs rampant on a platform designed to—and lauded for its endeavors to—prevent it. The Court should grant summary judgment in Apple's favor on Plaintiffs' willfulness claims.

Summary judgment also is warranted in Apple's favor on two of Plaintiffs' theories of copyright infringement: *first*, that Apple infringed Plaintiffs' purported copyrights by offering promotional clips of the sound recordings at issue; and *second*, that Apple infringed Plaintiffs' purported copyrights by "making available" the sound recordings in the iTunes Store.  Plaintiffs have failed to produce *any* evidence in support of the first theory, and the second, the "making available" theory, is not a cognizable theory of copyright infringement as a matter of law.  Summary judgment should be granted in Apple's favor on Plaintiffs' copyright infringement claims based on promotional streams and a rejected "making available" theory of liability.

For these reasons and those that follow, the Court should grant partial summary judgment to Apple on Plaintiffs' willfulness, promotional streams, and making available claims.

## II.  STATEMENT OF ISSUES TO BE DECIDED (L.R. 7-4(A)(3))

1.      Whether partial summary judgment should be granted to Apple, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56, dismissing with prejudice Plaintiffs' claims that Apple's alleged copyright infringement was willful;

2.      Whether partial summary judgment should be granted to Apple, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56, dismissing with prejudice Plaintiffs' copyright infringement claims based on promotional clips; and

3.      Whether partial summary judgment should be granted to Apple, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56, dismissing with prejudice Plaintiffs' copyright infringement claims based on a making available theory of liability.

## III.  FACTUAL BACKGROUND

### A.      Apple Launched The iTunes Store To Combat Music Piracy Over The Internet

Apple operates the iTunes Store, a digital store that offers music, movies, TV shows, and podcasts for sale via permanent download.[3]  Apple launched the iTunes Store in 2003 as a legal and inexpensive alternative to the music piracy that was plaguing artists, record companies, and the entire

---

[3]  The iTunes Store is available across the world.  These cases assert claims under the U.S. copyright laws for domestic acts of alleged infringement.  Accordingly, only the U.S. iTunes Store is at issue in these cases.  All references to the "iTunes Store" refer to the U.S. iTunes Store.

music industry.  As of today, more than ███████ sound recordings have been uploaded to Apple's iTunes Store, and between █████████████ new songs are uploaded to the iTunes Store each month.  Ex. 4 ¶ 34.[4]

## B.    Digital Downloads Of Sound Recordings Implicate Two Copyrights

Digital downloads of sound recordings implicate two copyrights:  (i) a copyright in the musical composition, i.e., the music and lyrics of a song, as reflected in sheet music; and (ii) a copyright in the sound recording embodying that composition, i.e., the recording artist's rendition of the musical composition as fixed in a vinyl record, CD, or digital file.  *Id.* ¶¶ 9–15.  A single musical composition can be embodied in multiple sound recordings created by different recording artists and/or record labels (e.g., both the Rolling Stones and Britney Spears released sound recordings of the musical composition, "(I Can't Get No) Satisfaction").  *Id.* ¶ 15.

The copyright in the musical composition is typically owned by the authors of the words and music and/or music publishers.  *Id.*  In copyright law, a mechanical license is a license from the holder of a copyright in a musical composition to another party, authorizing exploitation of that musical composition.  Licensing musical compositions is complex:  compositions are often owned by more than one songwriter and publisher (since multiple songwriters and composers may collaborate on a single composition); authoritative ownership information for compositions is generally not publicly available; large catalogs of musical compositions can change hands between publishers; and publishers can license musical compositions to third parties for a variety of uses.  *See id.* ¶¶ 28, 31.

The copyrights in sound recordings embodying musical compositions are, by contrast, generally owned by record labels, through contracts with the featured artists and producers.  *Id.* ¶ 20.  To exploit a sound recording, a specific sound recording license is required—in addition to a separate mechanical license for the musical composition embodied in the recording.  *Id.*

## C.    Plaintiffs Assert Copyright Infringement Solely With Respect To The Musical Compositions Allegedly Embodied In The Sound Recordings At Issue

The Plaintiffs in each of these three cases are the alleged partial owners of copyrights in 103

---

[4]  Citations to the expert report of Steven Marks are to the report served in the *Pickwick* case, No. 20-cv-02794-WHO.  Mr. Marks served substantively identical reports in the *Adasam* and *Genepool* cases.

musical compositions authored in part by Harold Arlen, Ray Henderson, or Harry Warren (the "Subject Compositions").  Plaintiffs SA Music LLC and William Kolbert, as Trustee of The Sam Arlen Trust, purport to own rights in Subject Compositions authored by Harold Arlen; Plaintiff Ray Henderson Music Co., Inc. purports to own rights in all Subject Compositions authored by Ray Henderson; and Plaintiff Four Jays Music Company purports to own rights in all Subject Compositions authored by Harry Warren.

Plaintiffs allege Apple infringed their copyrights in the Subject Compositions by offering for sale without authorization 1,206 sound recordings—among the more than ███████ sound recordings ever uploaded to the iTunes Store—collectively embodying the 103 Subject Compositions. Specifically, Plaintiffs allege that by offering for sale sound recordings that purportedly embody the Subject Compositions, Apple has infringed their copyrights in the following ways:

- ***Promotional Clips.***  Plaintiffs allege Apple reproduced and distributed copies of recordings embodying the Subject Compositions as promotional clips in the iTunes Store, in violation of their reproduction and distribution rights under sections 106(1) and 106(3) of the Copyright Act;

- ***Importation.***  Plaintiffs allege Apple imported phonorecords embodying the Subject Compositions, in violation of their importation and distribution rights under sections 602 and 106(3) of the Copyright Act, respectively;

- ***"Making Available."***  Plaintiffs allege Apple made available for sale sound recordings embodying the Subject Compositions, in violation of their distribution rights under section 106(3) of the Copyright Act; and

- ***Server Copies.***  Plaintiffs allege Apple reproduced and distributed permanent downloads of recordings embodying the Subject Compositions, including on Apple's servers, in violation of sections 106(1) and 106(3) of the Copyright Act.[5]

---

[5] Plaintiffs separately allege that Apple infringed their reproduction and distribution rights, under sections 106(1) and 106(3), by making available, reproducing, and distributing permanent downloads of the recordings embodying the Subject Compositions.  No. 20-cv-02965-WHO, Dkt. 45 ¶¶ 103–107; No. 20-cv-02146-WHO, Dkt. 34 ¶¶ 95–99; No. 20-cv-02794-WHO, Dkt. 66 ¶¶ 94–98.  This is duplicative of Plaintiffs' making available and server copy theories—which also allege that Plaintiffs made available, reproduced, and sold copies of permanent downloads of recordings embodying the Subject Compositions.

Gibson, Dunn &
Crutcher LLP

Plaintiffs do not allege ownership or infringement of any sound recording copyrights.  Their infringement claims pertain only to the underlying musical compositions—the Subject Compositions.

## D.   The Three Lawsuits At Issue

The sound recordings at issue in these three lawsuits were delivered to Apple for distribution in the iTunes Store by digital distributors, known as content providers, pursuant to digital distribution agreements among them and Apple.  *See, e.g.*, Exs. 5–10.  These content providers are Apple's respective co-defendants in each of these three cases:  Adasam and Adasam Limited ("Adasam"), *see* No. 20-cv-02146-WHO; Pickwick International, Pickwick Group Limited, Pickwick Australia Party Limited, and Mastercorp Party Limited ("Pickwick"), *see* No. 20-cv-02794-WHO; and Ideal Music ("Ideal") and Genepool Distribution Ltd. ("Genepool"), *see* No. 20-cv-02965-WHO (collectively, the "Content Providers").

### 1.   The *Adasam* Case (No. 20-cv-2146)

In the *Adasam* case, Plaintiffs allege they own rights in 44 musical compositions embodied in 146 sound recordings. Dkts. 34–34-4, 91.  They allege Adasam and Apple infringed Plaintiffs' rights in those compositions.  *See id.*[6]  As to Apple specifically, Plaintiffs allege Apple willfully infringed their copyrights by offering for sale the 146 sound recordings in the iTunes Store that Adasam delivered to Apple, and which purportedly embody the 44 musical compositions.  Dkt. 32.  Of the 44 musical compositions at issue in the *Adasam* case, three were embodied in sound recordings that were never sold in the iTunes Store.  Samplin Decl. ¶ 2.  And of the 41 compositions embodied in sound recordings that were sold, the gross proceeds of those sales, which took place over a 14-year period, amounted to $2,408.16.  *Id.*

Adasam has not appeared in the *Adasam* case, and Plaintiffs have not sought a default judgment against Adasam.  After the *Adasam* lawsuit was filed, Apple terminated Adasam as a content provider on June 25, 2020, and all of Adasam's content was removed from the iTunes Store, including all of the sound recordings at issue in the *Adasam* case.  Ex. 11.

---

[6]   Plaintiffs' First Amended Complaint, dated June 22, 2020, asserted copyright infringement of 50 musical compositions.  Dkt. 34-1.  On August 13, 2021, Plaintiffs voluntarily dismissed with prejudice their copyright infringement claims for six of those compositions.  Dkt. 91.

### 2.     The *Pickwick* Case (No. 20-cv-2497)

In the *Pickwick* case, Plaintiffs allege they own rights in 85 musical compositions embodied in 979 sound recordings.  Dkts. 66–66-4, 94.  They allege Pickwick and Apple infringed Plaintiffs' rights in those compositions.  *See id.*[7]  As to Apple specifically, Plaintiffs allege Apple willfully infringed their copyrights by offering for sale the 979 sound recordings in the iTunes Store that Pickwick delivered to Apple, and which purportedly embody the 85 musical compositions.  *Id.*  Of the 85 musical compositions at issue in *Pickwick*, only 58 were embodied in sound recordings that were actually sold in the iTunes Store.  Samplin Decl. ¶ 3.  The gross proceeds of those sales, which took place over a 14-year period, amounted to $3,106.83.  *Id.*

Pickwick has not appeared in the *Pickwick* case, and Plaintiffs have not sought a default judgment against Pickwick.  On November 17, 2020, Apple terminated Pickwick as a content provider, and all of Pickwick's content was removed from the iTunes Store, including the sound recordings at issue in the *Pickwick* case.  Ex. 12.

### 3.     The *Genepool* Case (No. 20-cv-02965)

In the *Genepool* case, Plaintiffs allege that Ideal provided Genepool with 81 sound recordings, who in turn provided them to Apple.  Dkts. 45–45-4, 83.  Plaintiffs allege they own rights in 35 musical compositions embodied in these 81 sound recordings—and that Ideal, Genepool, and Apple infringed Plaintiffs' rights in those compositions.  *See id.*[8]  As to Apple specifically, Plaintiffs allege Apple willfully infringed Plaintiffs' copyrights by offering for sale the 81 sound recordings in the iTunes Store that Genepool delivered to Apple, and which purportedly embody the 35 musical compositions.  *Id.*  Of the 35 musical compositions at issue in the *Genepool* case, only 28 were embodied in sound recordings that were actually sold in the iTunes Store.  Samplin Decl. ¶ 4.  The gross proceeds of those sales, which took place over a 10-year period, amounted to $1,282.05.  *Id.*

Genepool and Ideal have not appeared in the *Genepool* case, and Plaintiffs have not sought a

---

[7]  Plaintiffs' Second Amended Complaint, dated March 17, 2021, asserted copyright infringement in 90 musical compositions.  Dkt. 66-1.  On August 13, 2021, Plaintiffs voluntarily dismissed with prejudice their copyright infringement claims relating to five of those compositions.  Dkt. 94.

[8]  Plaintiffs' First Amended Complaint, dated September 14, 2020, asserted copyright infringement of 39 musical compositions.  Dkt. 45-1.  On August 13, 2021, Plaintiffs voluntarily dismissed with prejudice their copyright infringement claims for four of those compositions.  Dkt. 83.

Gibson, Dunn & Crutcher LLP

default judgment against either entity. Apple terminated Genepool as a content provider on November 11, 2019, before the *Genepool* case was filed, and all of Genepool's content was removed from the iTunes Store, including the sound recordings at issue in the *Genepool* case. Ex. 13.

The following summary table sets forth the number of compositions, sound recordings, and gross proceeds from the sales of the sound recordings, associated with each of the three lawsuits:

|  | No. 20-cv-2146 (*Adasam*) | No. 20-cv-2974 (*Pickwick*) | No. 20-cv-2965 (*Genepool*) |
|---|---|---|---|
| **Content Provider(s)** | Adasam | Pickwick | Genepool and Ideal |
| **Number of Compositions at Issue[9]** | 44 | 85 | 30 |
| **Number of Sound Recordings at Issue** | 146 | 979 | 81 |
| **Gross Proceeds of the Sales of the Sound Recordings at Issue** | $2,408.16 | $3,106.83 | $1,282.05 |

## E.     The Content Providers Completed Apple's Application Process

Before being permitted to distribute song recordings in the iTunes Store, Apple required the Content Providers to complete a number of steps, including applying to become a content provider and entering into various contracts. First, each of the Content Providers were required to complete Apple's iTunes Connect online application process. Exs. 14–16 (detailing application submission process); Ex. 17 at 36:20-37:7. The application "is intended only for people who either own or control a catalog of content for digital distribution" or their authorized representatives. Ex. 14 at -1719; Ex. 15 at -352; Ex. 16 at -220.

Content provider applicants must complete a separate application for each type of media they seek to distribute on iTunes (e.g., music, movies, TV shows, or podcasts). Ex. 14 at -1719; Ex. 15 at -352; Ex. 16 at -220. To be approved as a content provider, the applicant must meet Apple's threshold technical, content, and financial requirements. Ex. 14 at -1720; Ex. 15 at -352; Ex. 16 at -221. The technical requirements largely concern hardware and software features the applicant must use to

---

[9] Although there are 159 compositions at issue across the three cases, certain compositions are at issue in more than one case. There are 103 *unique* compositions at issue across the three cases.

distribute content to Apple.  Ex. 14 at -1720; Ex. 15 at -352; Ex. 16 at -221.  The content requirements include that the applicant possess a minimum catalog size of 20 albums with industry-standard, unique digital identifiers for each sound recording to be distributed.  Ex. 14 at -1720; Ex. 15 at -352; Ex. 16 at -221.  These identifiers include universal product codes ("UPCs") and international standard recording codes ("ISRCs") for each sound recording.  Ex. 14 at -1720; Ex. 15 at -352; Ex. 16 at -221.  The financial requirements include a U.S. Tax ID and a valid iTunes Store account, with a credit card on file.  Ex. 14 at -1720; Ex. 15 at -352; Ex. 16 at -221.

In addition, to distribute content in the iTunes Store, a content provider applicant must authenticate its iTunes Store Account with a first and last name, Apple ID, and password already set up for use in the iTunes Store.  Ex. 14 at -1721; Ex. 15 at -353; Ex. 16 at -222.  The applicant also must represent and warrant that it is authorized to enter into agreements on behalf of the individual or entity who will distribute content to Apple.  Ex. 14 at -1721; Ex. 15 at -353; Ex. 16 at -222.  Content provider applicants are further required to provide a physical address and other contact information, and to indicate the geographic territories in which they control digital distribution rights for the content they seek to deliver to Apple.  Ex. 14 at -1722; Ex. 15 at -354; Ex. 16 at -223.  The applicants must further identify the genre of content they seek to distribute, and provide information about the size of their catalogs, including the number of sound recordings in the catalog and the primary artists or labels.  Ex. 14 at -1723; Ex. 15 at -355; Ex. 16 at -224.  Finally, content provider applicants must certify that all information they provide to Apple during this application process is accurate and complete.  Ex. 14 at -1723; Ex. 15 at -355; Ex. 16 at -224.

## F.     The Content Providers Contractually Guaranteed Apple That The Subject Compositions Were Properly Licensed

Next, the Content Providers were required to enter into (and keep current) contracts with Apple governing the distribution of sound recordings.  Apple thus entered into numerous contracts with the Content Providers between 2005 and 2019.  *See* Exs. 5–10.  In each of these contracts, the Content Providers agreed to appoint Apple as a "reseller" of "eMasters"—i.e., digital sound recordings.  *See, e.g.*, Ex. 5 at 4; Ex. 6 at 2; Ex. 7 at 3; Ex. 8 at 2; Ex. 9 at 4; Ex. 10 at 2.  The Content Providers granted Apple "a non-exclusive right" to, among other things, distribute, promote, and sell the sound recordings

and their associated content (such as promotional clips, album artwork, and lyrics) in the iTunes Store. *See, e.g.*, Ex. 5 at 4–5; Ex. 6 at 2–3; Ex. 7 at 3–4; Ex. 8 at 2–3; Ex. 9 at 4; Ex. 10 at 2–3.  The Content Providers represented and warranted that they had "the full authority" to enter into the agreements; that they owned or controlled "the necessary rights in order to make the grant of lights, licenses and permissions herein"; that Apple's exercise of those "rights, licenses and permissions" would not violate or infringe the rights of any third party; and that the Content Providers were in compliance with "any applicable laws." *See, e.g.*, Ex. 5 at 13–14; Ex. 6 at 11–12; Ex. 7 at 11–12; Ex. 8 at 11–12; Ex. 10 at 11–12.

Consistent with the Content Providers' representations that they had obtained the necessary authorizations to grant Apple a non-exclusive license to the sound recordings (including the underlying musical compositions), the Content Providers further agreed to take responsibility for and timely pay (i) all royalties due to those with rights in the sound recordings; (ii) all royalties due to those with rights in the musical compositions embodied in the sound recordings (i.e., mechanical royalties); (iii) all payments that may be required under any collective bargaining agreements applicable to the Content Providers; and (iv) any other royalties payable with respect to the sound recordings and associated artwork or metadata.  *See, e.g.*, Ex. 5 at 6; Ex. 6 at 4; Ex. 7 at 5; Ex. 8 at 4; Ex. 9 at 5; Ex. 10 at 4.  The Content Providers also agreed to indemnify Apple from any liability arising from a third-party claim that the Content Providers breached any of these representations and warranties.  *See, e.g.*, Ex. 5 at 12–13; Ex. 6 at 10–11; Ex. 7 at 10–11; Ex. 8 at 10–11; Ex. 9 at 11–12; Ex. 10 at 10–11.  Apple in turn agreed to remit payment to the Content Providers for sales of the sound recordings in the iTunes Store. *See, e.g.*, Ex. 5 at 8–9; Ex. 6 at 7–8; Ex. 7 at 6–7; Ex. 8 at 7–8; Ex. 9 at 8; Ex. 10 at 7–8.  The responsibility for obtaining mechanical licenses with respect to permanent downloads thus rested with the Content Providers.

## G.     Apple's Contracts With Content Providers Are Industry Standard By Necessity

This distribution arrangement—whereby content providers are responsible for obtaining the rights to distribute the music they supply to Apple—is industry standard, by necessity.  Third-party retailers like Apple are not in a position to themselves secure licenses from the copyright owners for each sound recording they sell (i.e., the mechanical license to the musical composition and the license

to the sound recording).  Ex. 4 ¶¶ 22, 33–34.  Retailers do not have access to certain of the information necessary to license the compositions, such as percentage splits among a composition's owners.  *Id.* ¶ 23.  Apple therefore cannot feasibly verify that information, and then facilitate payment of the various owners for the many millions of unique sound recordings sold each year.  *Id.* ¶¶ 22, 33–34.

This is why for decades, record labels have assumed responsibility for obtaining the licenses necessary to exploit sound recordings—and have then passed those licenses to third-party retailers through contract.  *Id.* ¶¶ 27–29.  Because record labels coordinate the creation of a sound recording (for example, by signing artists and organizing the recording process, and the licensing for distribution of the recording to the public), they must first determine who owns the underlying rights to the compositions being recorded, and ensure that all necessary licenses and rights have been "cleared."  *Id.* ¶¶ 10, 12, 25, 34.  The record labels and their downstream distributors accordingly over time have developed mechanisms to obtain the mechanical and sound recording rights to large catalogs of sound recordings.  *Id.* ¶ 25.  The content providers that supply music to Apple work with record labels and content owners to license content.  The content providers, like the record labels, are thus best situated to assume responsibility for acquiring the licenses necessary to exploit the work.

In other words, the music industry allocates licensing responsibility to the best situated parties in the distribution chain:  record labels and content providers obtain the authorizations necessary to grant retailers non-exclusive licenses to exploit sound recordings and embodied musical compositions.  And they do so through digital distribution agreements in which they represent and warrant to retailers that they have the authority to grant such licenses.  *Id.* ¶¶ 43, 48, 50.  This is the type of digital distribution arrangement on which Apple relied in offering for sale the sound recordings at issue.

## H.    Apple Maintains A Robust "Notice And Takedown" Program To Remove Any Content About Which It Receives Allegations Of Infringement

In addition to securing licenses and representations and warranties from content providers that passed Apple's application process, in 2010, Apple adopted a "notice and takedown" procedure to protect against copyright infringement in the iTunes Store.  *See* Ex. 18 (iTunes' notice and takedown procedure is intended to assist in addressing potential "violation[s] of your intellectual property rights"); Ex. 19 at 14:18–16:16.  This published notice and takedown procedure was in effect before

Plaintiffs filed any of the three cases, and remains in effect today.  *See id.* at 14:24–15:6, 18:1–4.

Pursuant to Apple's notice and takedown procedure, any copyright owner that believes a sound recording available in the iTunes Store is unauthorized can request (through Apple's website or email) that Apple remove the recording from the iTunes Store.  *Id.* at 18:5–19:21.  After a third party submits a takedown notice, Apple provides the content provider that supplied the recording with the identity of the party submitting the takedown request, the content at issue, and the nature of the right asserted by the complaining party (e.g., sound recording copyright, image copyright, composition copyright).  *Id.* at 26:8–27:2, 83:9–14.  Apple informs the content provider that it has five days to respond to the complaint, and that if it does not respond by asserting rights to the content, Apple will remove the content from the iTunes Store.  *Id.*; *see also, e.g.*, Ex. 20; Ex. 21; Ex. 22.  Apple also emails the complainant to let them know that the takedown notice has been received, the content provider has been contacted, and the content provider has five days to respond.  *See, e.g.*, Ex. 23; Ex. 24; Ex. 25.

Upon receiving a takedown notice, the content provider will often immediately remove the content at issue—either while it investigates the complaint or simply to avoid a dispute.  If the content provider does not respond to Apple's email within the allotted five business days, Apple removes the content from the iTunes Store without making any finding as to whether the complaint has merit.  Ex. 19 at 90:1–5.  If a content provider responds to contest the complaint and reaffirm their rights to distribute the content, Apple puts the complainant and the content provider in touch with each other to resolve the dispute.  *Id.* at 110:10–20.  In other words, Apple's practice (absent a genuine dispute between the content provider and the complainant regarding conflicting rights) is to promptly remove the allegedly unauthorized content from the iTunes Store.  Apple does not take a position on whether the content is infringing, *id.* at 131:17–24—in many instances, Apple (or the applicable content provider) may be removing content that is *not* infringing.  When the content is removed, Apple informs the complainant of the removal.  *See, e.g.*, Ex. 26; Ex. 27; Ex. 28.

This is the standard, uniform process for requesting that music be removed from the iTunes Store for all complainants and content providers, regardless of their notoriety or size.  Whether the complainant is an unknown recording artist or music publisher, or a major record label or publisher—such as Universal Music Group, or Sony/ATV—all use Apple's notice and takedown system to alert

Apple of potential infringement.   Ex. 19 at 60:14–18, 63:19–24, 87:20–23, 140:7-16, 141:17-20. Similarly, the content providers about which Apple receives takedown notices for music span the range of content providers:  Apple receives takedown notices for music provided by the major record labels and by small, lesser-known labels alike.  *Id.* at 161:15–162:4.

## I.   Apple Had No Reason To Suspect The Subject Compositions Were Unauthorized

Despite Plaintiffs' contentions to the contrary, nothing about the sound recordings at issue in these cases indicated that the underlying Subject Compositions were unauthorized.  These sound recordings accounted for only $6,797 in sales from the iTunes Store over a 14-year period.  And the takedown notices Apple received in that period concern only nine sound recordings at issue in the *Adasam* case, 27 recordings at issue in the *Pickwick* case, and two recordings at issue in the *Genepool* case.  Declaration of Erin Cook ("Cook Decl.") ¶¶ 6, 8, 10.

The total number of takedown notices Apple *ever* received concerning content provided by the Content Providers (i.e., including content not at issue in these cases) also represents a tiny fraction of the Content Providers' overall catalogs.  Adasam supplied a total of 49,643 tracks to Apple; Apple received only 215 takedown notices concerning Adasam content over 10 years.  Samplin Decl. ¶ 5; Cook Decl. ¶ 5.  Pickwick supplied 259,571 tracks to Apple; Apple received only 184 takedown notices concerning Pickwick content over 10 years.  Samplin Decl. ¶ 6; Cook Decl. ¶ 7.  Genepool supplied 39,728 tracks to Apple; Apple received only 66 takedown notices concerning Genepool content over 9 years.  Samplin Decl. ¶ 7; Cook Decl. ¶ 9.

In response to the takedown notices Apple received, Apple informed the Content Providers, per its standard practice, that Apple had received notice that certain of their content was allegedly unauthorized.  *See, e.g.*, Exs. 20–22.  (These notices always came from third parties; Plaintiffs in these cases never availed themselves of Apple's notice-and-takedown procedure.  *See supra* Section III.H.) Adasam, Genepool, and Pickwick routinely and promptly responded by removing the content from the iTunes Store—further diminishing any concern about any potential infringement.  *See, e.g.*, Ex. 29 (Adasam:  "Kindly note that we have removed these sound recordings notified to us from sale while we investigate this claim."); Ex. 30 (Pickwick:  "We agree to relinquish US rights in this recording and have amended our records accordingly."); Ex. 31 (Genepool:  "I have removed these from U.S.

Territories"). Apple has received no indication from Adasam or Pickwick that those Content Providers removed the content because they knew or agreed that the content was infringing. Cook Decl. ¶¶ 6, 8, 10. And Genepool's director testified that he removed content "to avoid a dispute"—not because he agreed that Genepool's content was infringing. Ex. 32 ¶ 2 (Genepool's director explaining that, upon receipt of a takedown request, Genepool "immediately remove[d] the content at issue to avoid a dispute," and not because "it knows or believes the content is infringing"); *see also* Cook Decl. ¶ 10.

Further, while Apple was previously involved in litigation concerning certain content Adasam and Pickwick supplied to Apple, nothing about that lawsuit indicates that the Subject Compositions at issue in the *Adasam* and *Pickwick* cases here were unauthorized. In 2012, Apple was sued in a putative class action lawsuit in which a *different* plaintiff alleged that Apple infringed its purported copyrights in *different* musical compositions by selling *different* sound recordings embodying those compositions in the iTunes Store that had been provided to Apple by Adasam. *See Blagman v. Apple Inc.*, No. 12-cv-5453-ALC-JCF (S.D.N.Y. 2015) ("*Blagman*"). The *Blagman* lawsuit settled in 2016. ███

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Simply put, to the extent Apple received takedown notices concerning the Content Providers, nothing about the notices was unusual or indicative of infringement of the Subject Compositions.

## J.   Plaintiffs Declined To Use Apple's Notice And Takedown System

Each Plaintiff testified that before these lawsuits, they never sent Apple a single takedown notice with respect to any of the sound recordings or Subject Compositions at issue. *See* Ex. 36 at 62:15–63:9, 63:24–64:4; Ex. 37 at 77:19–78:7; Ex. 38 at 154:5–155:13; Ex. 39 at 144:23–147:4. Nor did Plaintiffs take *any* other steps before filing to notify Apple that potentially unauthorized sound recordings or compositions were available in the iTunes Store. *See* Ex. 36 at 62:15–63:9, 63:24–64:4; Ex. 37 at 77:19–78:7; Ex. 38 at 154:5–155:13; Ex. 39 at 144:23–147:4.

Plaintiffs could have followed Apple's standard notice and takedown procedure for removing the allegedly unauthorized sound recordings from the iTunes Store before filing these cases.  That would have avoided these disputes years ago—and obviated these lawsuits altogether.  *See supra* Section III.H.  Instead, Plaintiffs' counsel elected *not* to have Plaintiffs notify Apple about any of the alleged infringement before filing, in the hopes of securing a windfall of millions of dollars in statutory damages and attorneys' fees based on sound recordings that generated less than $7,000 in sales combined.  The lawyer-driven tenor of these litigations is strikingly apparent from Plaintiffs' utter lack of knowledge about any of the allegations and claims in the cases:

*Plaintiff SA Music LLC (Arlen Compositions)*.  Plaintiff SA Music LLC's Rule 30(b)(6) witness, Sam Arlen, testified that:

- He did not personally take any steps to confirm whether the Arlen Subject Compositions SA Music LLC purports to own were available in the iTunes Store;

- He had not seen any evidence of Apple's knowledge of whether the Arlen Subject Compositions embodied in the sound recordings at issue were licensed; and

- "All information" in the lawsuits was "provided by the investigation that was conducted by [his] attorneys."

Ex. 38 at 77:5–9, 78:15–24, 105:25–106:16, 136:4–6.

*Plaintiff William Kolbert (Arlen Compositions).*  Plaintiff William Kolbert, as Trustee of The Sam Arlen Trust, testified that:

- He was not sure whether he had read any of the filings in these cases;

- He did not know whether any Arlen Subject Compositions were ever offered for sale in the iTunes Store;

- He "was never advised at any time . . . that Harold Arlen's music was available on iTunes";

- His attorneys "did all the investigative work" relating to these lawsuits;

- The Arlen Trust did not engage in any of its own investigation; and

- He was advised by his attorneys "that there have been copyright infringements."

Ex. 39 at 84:11–85:4, 86:12–25, 88:12–89:11, 95:3–15, 99:2–16, 112:21–113:4.

***Plaintiff Ray Henderson Music Company (Henderson Compositions).*** Plaintiff Ray Henderson Music Co., Inc.'s Rule 30(b)(6) witness, Janet Kemp, testified that:

- She did not review the complaints in all three of these cases before they were filed;
- Ray Henderson Music Co. Inc. did not take any steps to investigate the alleged infringement or confirm whether it received royalties; and
- Ray Henderson Music Co. Inc. relied entirely on its attorneys in connection with these lawsuits.

Ex. 39 at 11:20–12:2, 52:24–53:25, 56:20–58:8.

***Plaintiff Four Jays Music Company (Warren Compositions).*** Plaintiff Four Jays Music Company's Rule 30(b)(6) witness, Julia Riva, testified that:

- She did not review the complaints before they were filed;
- Four Jays did not do anything to confirm the Warren Subject Compositions were embodied in the sound recordings at issue;
- Four Jays did not do anything to confirm Apple was committing the alleged infringement; and
- No one at Four Jays does anything to monitor what Harry Warren songs are available in the iTunes Store.

Ex. 36 at 38:9–22, 40:14–25, 52:4–17, 54:8–23, 58:3–10.

## IV.  PROCEDURAL BACKGROUND

### A.    Plaintiffs' Original Lawsuit

The three lawsuits at issue were filed in 2020—but they arise from a single lawsuit Plaintiffs originally filed one year prior.  On May 9, 2019, Plaintiffs filed a 148-page complaint against Apple and many other defendants for copyright infringement in the Central District of California.  *SA Music, LLC v. Apple Inc. et al*, No. 2:19-cv-04073-JFW-RAO, Dkt. 1 (C.D. Cal. May 9, 2019).  The complaint named dozens of defendants and asserted 216 causes of action for copyright infringement.  *Id.*  Each cause of action was brought against a different "distribution chain," or group of entities involved in the distribution of a sound recording—such as a label, a content provider, and a digital service provider.  *Id.*

On September 5, 2019, Judge Walter of the Central District issued an order to show cause why the court should not sever and dismiss the claims of all but one defendant, observing that "[i]t appears that Plaintiffs have combined their claims against the Defendants in a single action without satisfying requirements of Federal Rule of Civil Procedure 20(a)(2)." No. 2:19-cv-04073-JFW-RAO, Dkt. 218 (C.D. Cal.). In a second Order to Show Cause issued the same day, Judge Walter noted that the multi-plaintiff, multi-defendant suit would impose "a severe strain on the Court's limited resources." No. 2:19-cv-04073-JFW-RAO, Dkt. 219 (C.D. Cal.). In response to these Orders to Show Cause, Plaintiffs acknowledged that their case was "unwieldy." No. 2:19-cv-04073-JFW-RAO, Dkt. 221 at 2 (C.D. Cal. Sept. 10, 2019). Plaintiffs submitted that "the most efficient way to divide and proceed with these claims is by distribution chains, as the entities in each chain are jointly and severally liable for the alleged infringements and would be properly joined in one action." *Id.* at 2–3. The Court agreed, and dismissed the case as to all but one distribution chain.

In 2020, Plaintiffs began filing separate lawsuits across the Ninth Circuit against the other distribution chains named in their original lawsuit, including these three cases. The parties proceeded with separate discovery and motion practice in the cases, producing documents specific to each case.

**B.      The Court Consolidates Summary Judgment Briefing In These Cases**

On July 22, 2021, Plaintiffs moved to consolidate the *Adasam*, *Pickwick*, and *Genepool* cases for trial under Fed. R. Civ. P. 42(a). No. 20-cv-02965-WHO, Dkt. 69; No. 20-cv-02146-WHO, Dkt. 76; No. 20-cv-02794-WHO, Dkt. 78. Apple opposed these motions as an attempted end-run around Judge Walter's Order to Show Cause, an attempt to improperly use evidence relevant to only one case in other cases, and because consolidation would not create significant efficiencies in view of the different evidence across the three cases. No. 20-cv-02965-WHO, Dkt. 78; No. 20-cv-02146-WHO, Dkt. 84; No. 20-cv-02794-WHO, Dkt. 87.

On August 30, 2021, the Court designated the three cases related pursuant to Civil L.R. 3-12. No. 20-cv-2146-WHO, Dkt. 95. During the September 14, 2021 status conference, the Court requested that the parties consolidate summary judgment briefing in the three cases, and stated that it would decide Plaintiffs' motions to consolidate the cases for trial at a later date—following review of summary judgment briefing. *Id.*, Dkt. 94. The Court set a hearing on summary judgment motions for

1   January 26, 2022.  *Id.*, Dkt. 97.

## V.  LEGAL STANDARD

A moving party "is entitled to judgment as a matter of law" on "each claim or defense—or the part of each claim or defense"—for which the movant demonstrates "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  Material facts are those that "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuine issue of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the non-moving party bears the burden of proof at trial, the moving party need only demonstrate that "there is an absence of evidence to support the non-moving party's case."  *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  The non-moving party must then set out "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  That party must "make a showing sufficient to establish the existence of [the] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  This burden cannot be carried by "conclusory allegations unsupported by factual data," *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), or a "mere . . . scintilla of evidence," *Anderson*, 477 U.S. at 252.  The nonmoving party "must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

Partial summary judgment is appropriate as to liability on a subset of copyright claims, *see Applied Bus. Software, Inc. v. Citadel Serv. Corp.*, 2019 WL 1949455, at *5–10 (C.D. Cal. Mar. 26, 2019); *Frerck v. Pearson Educ., Inc.*, 63 F. Supp. 3d 882, 886 (N.D. Ill. 2014), or as to certain aspects of damages, such as whether the alleged copyright infringement was willful, *United Fabrics Int'l, Inc. v. J. C. Penney Corp.*, 2009 WL 10674938, at *3 (C.D. Cal. Apr. 10, 2009).

# VI. ARGUMENT

## A. None Of Apple's Alleged Infringement Was Willful[10]

If "the court finds[] that infringement was committed willfully," a copyright plaintiff may recover enhanced statutory damages. 17 U.S.C. § 504(c)(2). To establish willfulness under the Copyright Act, a copyright owner must show "(1) that [the defendant] was actually aware of the infringing activity, or (2) that the [defendant's] actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights." *VHT. Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 748 (9th Cir. 2019). "The plaintiff bears the burden of proving willfulness." *Taylor Holland LLC v. MVMT Watches, Inc.*, 2016 WL 6892097, at *13 (C.D. Cal. Aug. 11, 2016).

Here, even if Plaintiffs prove infringement at trial (which Apple disputes), they can *never* meet their burden of demonstrating Apple actually knew of, or was willfully blind to, the alleged infringement. The Court should grant Apple summary judgment on Plaintiffs' claims for enhanced statutory damages based on their unsubstantiated theory that Apple's purported infringement was willful.

### 1. Apple Did Not Have Actual Knowledge Of The Alleged Infringement

A defendant's "actual knowledge" must extend to the "specific acts of infringement" alleged. *Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072-73 (9th Cir. 2013); *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 833 (9th Cir. 2019) (plaintiffs bear the burden of proving actual knowledge as to the infringement at issue).

Here, Plaintiffs have produced *no* evidence that Apple actually knew of the alleged infringement in these cases before they were filed. To the contrary, the undisputed facts demonstrate that Apple *first* became aware of the alleged infringements of Plaintiffs' purported copyrights in the Subject Compositions only *after* Plaintiffs sued Apple. Indeed, not a single Plaintiff availed itself of Apple's notice and takedown system, which would have put Apple on notice of the alleged

---

[10] While Apple does not move for summary judgment on Plaintiffs' infringement claims, Apple strongly disputes liability for the alleged infringement. Numerous genuine issues of material fact exist, for example, as to whether Plaintiffs can demonstrate that they own valid copyrights in the Subject Compositions. *See infra* n.11. But while the issue of infringement is appropriate for resolution at trial, no reasonable jury could ever find that Apple's alleged infringement was *willful* for the reasons explained in this Motion, and thus summary judgment on Plaintiffs' willfulness claim is warranted in Apple's favor.

infringement before Plaintiffs filed their lawsuits.  *See e.g.*, Ex. 36 at 63:5–64:3; Ex. 37 at 78:2–7; Ex. 38 at 153:14–154:9; Ex. 39 at 116:10–18 (admissions that none of the Plaintiffs used Apple's notice and takedown system or otherwise notified Apple about the alleged infringement before filing suit). Instead, Plaintiffs sat on their hands until their counsel—who had been constructing these cases since 2017—filed these suits.

These undisputed facts preclude a finding of actual knowledge as a matter of law.  In *Danjaq LLC v. Sony Corporation*, for example, the Ninth Circuit held that the defendant's allegedly infringing conduct was not willful because the defendant was "not on notice before the current litigation" of the copyright holder's purported rights to the content at issue.  263 F.3d 942, 958–59 (9th Cir. 2001) (affirming no willful infringement).  In *United Fabrics International v. J. C. Penney Corporation*, the court found that two defendants did not have actual knowledge of the alleged infringement because neither "received a cease and desist demand *from [p]laintiff*, nor did [p]laintiff produce any such letters in discovery."  2009 WL 10674938, at *3 (C.D. Cal. Apr. 10, 2009) (emphasis added).  In view of these undisputed facts, the *United Fabrics International* court concluded that there was "no genuine issue of material fact on the issue of willful copyright infringement" as to the two defendants, and granted them summary judgment on the issue of willfulness.  *Id.*  The court in *Atari Interactive, Inc. v. Redbubble, Inc.* found the same:  the plaintiff failed to establish the defendant's actual knowledge of the alleged infringement largely because the defendant was not on notice of the specific, alleged infringement before the lawsuit was filed.  515 F. Supp. 3d 1089, 1115–17 (N.D. Cal. Jan. 28, 2021).

The circumstances here are no different.  Plaintiffs' failure to inform Apple of the alleged infringement in these cases before filing dooms Plaintiffs' theory of actual knowledge.

**2.      Apple Did Not Recklessly Disregard And Was Not Willfully Blind To The Alleged Infringement**

Nor can Plaintiffs meet their burden of demonstrating Apple recklessly disregarded or was willfully blind to the alleged infringement.  To establish that Apple recklessly disregarded or was willfully blind, Plaintiffs must show Apple took "deliberate actions to avoid confirming a high probability of wrongdoing," such that Apple "can almost be said to have actually known the critical facts."  *Erickson Prods.*, 921 F.3d at 833 (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S.

754, 769–70 (2011)).   The records in these cases conclusively demonstrate the opposite:   Apple reasonably believed the necessary licenses and authorizations were in place and took affirmative steps to *prevent* copyright infringement.   Under the well-established law of this Circuit, no reasonable jury could conclude in these circumstances that Apple recklessly disregarded or was willfully blind to any alleged infringement of Plaintiffs' purported copyrights.

### a.   Apple's Good Faith Reliance On Its Contracts With The Content Providers Dooms Plaintiffs' Willfulness Allegations

The Content Providers contractually guaranteed Apple that they had secured all licenses necessary for Apple to exploit the sound recordings at issue.   Hornbook Ninth Circuit law and industry practice dictate that Apple reasonably relied on these contractual guarantees.   Plaintiffs' arguments to the contrary depend on a negligence standard that the Ninth Circuit has routinely rejected in the context of a copyright infringement willfulness inquiry.   Because Apple reasonably believed it had the right to offer the sound recordings and underlying musical compositions for sale in the iTunes Store, Plaintiffs' willfulness claims necessarily fail.

### (i)   Ninth Circuit Precedent Dictates That Apple Reasonably Relied On The Content Providers' Contractual Representations

It is black-letter law in the Ninth Circuit that a defendant does not willfully commit copyright infringement where it reasonably believes it secured a license authorizing the conduct.   *See Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012) ("Willfulness does not exist . . . where infringing works were produced . . . under a reasonable belief that the infringer possesses a license . . . ."); *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 515 (9th Cir. 1985) (affirming defendants' "conduct was not willful" because they "reasonably could have believed that their production was not infringing plaintiffs' copyrights").   Numerous courts have disposed of willfulness claims where the defendant relied on a license that appeared to cover the allegedly infringing conduct, or on representations that the defendant's use of the copyrighted material was authorized.

In *Frank Music Corp.*, for example, the defendants had a license agreement with ASCAP that they believed would cover their use of the plaintiffs' music in a play the defendants produced.   772

F.2d at 510.  Although the Ninth Circuit found that the defendants' ASCAP license did not in fact authorize the defendants' use of the plaintiffs' music, it affirmed the district court's dismissal of the plaintiffs' willfulness allegations because the defendants' belief that the ASCAP license protected their use of the plaintiffs' music was reasonable.  *Id.* at 515.  In *Adams v. Agrusa*, the court likewise found on summary judgment that the defendant did not willfully infringe the plaintiffs' copyrights in certain photographs based on her reliance on her co-defendant's representations that the co-defendant owned them.  2016 WL 7665410, at *2 (C.D. Cal. July 1, 2016), *aff'd*, 693 F. App'x 563 (9th Cir. 2017).  And in *Fahmy v. Jay Z*, the court found it appropriate to conclude that summary judgment can be granted in the defendants' favor regarding willful infringement during the time period in which the defendants had relied on a settlement agreement that purported to grant them "colorable title" to use the copyrighted music at issue.  2015 WL 5680299, at *12 (C.D. Cal. Sept. 24, 2015).

Here, summary judgment on Plaintiffs' willfulness allegations is similarly warranted.  There is no dispute that the Content Providers purported to grant Apple licenses that cover the allegedly infringing conduct at issue in these cases.  *See* Ex. 6 at 2–3; Ex. 8 at 2–3; Ex. 10 at 2–3 (granting Apple "a non-exclusive right" to distribute and sell the sound recordings and their associated content, such as promotional clips, album artwork, and lyrics, in the iTunes Store.).  Nor is there any dispute that the Content Providers further represented and warranted that they "had the full authority" to enter into the agreements with Apple; that they owned or controlled "the necessary rights" to grant Apple the "licenses and permissions" they granted Apple; that Apple's exercise of the licenses would not violate the intellectual property rights of any third party; that the Content Providers would be responsible to timely pay all mechanical royalties due to those with rights in the musical compositions embodied in the sound recordings they delivered; and that the Content Providers would indemnify Apple for any liability associated with their breach of those warranties.  *See* Ex. 6 at 4, 10–12; Ex. 8 at 4, 10–12; Ex. 10 at 4, 10–12; *see also* Ex. 17 at 112:18–113:5, 117:2–3, 122:16–18, 138:12–14, 140:4–7 (explaining that Apple relies on the representations and warranties of its content providers that the content they deliver to the iTunes Store is properly licensed).

There also is no dispute that Apple secured these licenses and representations from the Content Providers numerous times for over a *decade*—after the Content Providers underwent Apple's

application process to become content providers for the iTunes Store, including by satisfying Apple's technical, financial, content, authentication, and other requirements.  *Supra* Section III.E; Ex. 17 at 37:8–24, 196:1–21 (explaining the "up-front diligence that is done" and "which takes place through the iTunes Connect application form," in addition to "diligence which is done off-line internally," such as "a team that will check for content providers that have previously attempted to defraud Apple and maybe terminated").  Thus, Apple reasonably believed its contracts with the Content Providers authorized Apple to distribute and sell the sound recordings at issue in these cases—and that the Content Providers had secured the rights necessary for Apple to do so, including the rights to the underlying Subject Compositions.  Apple's reasonable reliance precludes a finding of willfulness.

That Apple's reliance on the representations and warranties from the Content Providers was reasonable is further compelled by the Ninth Circuit's recent decision in *Zillow*.  There, a real estate photography company sued an online real estate marketplace for copyright infringement because certain intermediaries of housing-related digital content (digital "feed providers") had uploaded the plaintiff's photographs to the defendants' website, and used them without authorization.  918 F.3d at 730.  As in Apple's contracts with the Content Providers, the defendants' contracts with the feed providers in *Zillow* purported to grant the defendants an express license to use and distribute the allegedly infringing material—and "the agreements include[d] unambiguous representations by the feed providers that they ha[d] the authority to assign such rights."  *Id.* at 732, 749.  The Ninth Circuit held that those representations rendered reasonable the defendants' belief that the feed providers had properly licensed the material, especially because the defendants "did not have access" to the purported licenses between the plaintiff and the intermediaries.  *Id.* at 749–50 (vacating jury finding of willfulness accordingly, and reversing district court's denial of judgment notwithstanding the verdict on willfulness).  So, too, here:  Apple's reliance on the Content Providers' substantially similar representations to those of the feed providers in *Zillow* was reasonable, and summary judgment is warranted in Apple's favor on willfulness as a result.

The complexity of the chain of title of the Subject Compositions further demonstrates that Apple's reliance on the contractual guarantees of its Content Providers was reasonable.  In *Danjaq*, the Ninth Circuit found that that "[t]he complexity of the chain of title to the various elements" of the

copyrighted works at issue "further precludes a jury finding of willful infringement," where, as here, they were presented to the alleged infringer "under color of title."  263 F.3d at 959.  The chain of title of the Subject Compositions in these cases is similarly complex:  the works date back to the *1920s*. There are accordingly *numerous* transfers of the underlying copyrights over *decades*, gaps in the chain of title in certain instances, and ongoing legal disputes over the validity of certain assignments of the copyrights at issue.  The old age of the works also means they are governed by the older 1909 Copyright Act and its complex renewal scheme (which Congress did away with in the current 1976 Act), raising additional questions concerning the validity of certain renewals.  In view of these complexities, it decries reason to suggest that Apple was willfully blind to the alleged infringement for failing to take additional steps to confirm that the Content Providers actually had the licenses they contractually affirmed they had secured.  Apple's reliance on the Content Providers' representations was reasonable.

### (ii) Industry Practice Further Dictates That Apple Reasonably Relied On The Content Providers' Contractual Representations

That Apple's reliance on the Content Providers' representations was reasonable is additionally compelled by industry practice.  As a digital retailer, Apple is not in a position to independently verify the mechanical rights of every composition embodied in every sound recording available in the iTunes Store:  Apple is not privy to the underlying contracts and assignments that dictate chain of title for a given composition.  *See supra* Section III.G; Ex. 4 ¶ 33.  Record labels and content providers, by contrast, work directly with music publishers to administer composition rights of the sound recordings they deliver to retailers.  Ex. 4 ¶¶ 10, 12, 27–29.

That is why Apple relies on the content providers and record labels who distribute those sound recordings to Apple to secure, and covenant that they have secured, the necessary rights—as is the practice among online music distribution platforms generally.  *See id* ¶ 43 (explaining that obtaining covenants from distributors or labels of sound recordings is "the practice of every other online music distribution platform of which [he is] aware"); *id.* ¶¶ 28–34  (detailing industry practice for digital retailers to rely on record labels and distributors to obtain the necessary authorizations with respect to mechanical rights).  Apple's reliance on its contracts with the Content Providers is consistent with industry practice and common sense.

1

(iii)   **Apple's Reliance On The Content Providers' Contractual**

2

**Representations Is Not Governed By A Negligence Standard**

3       In response to these facts evidencing a lack of willfulness, Plaintiffs undoubtedly will argue—

4   as they have throughout these cases—that Apple did not reasonably rely on the contracts with its

5   Content Providers because it "should have" done more to confirm the Content Providers'

6   representations.  Plaintiffs may argue that Apple "should have" done more to investigate the Content

7   Providers because they are lesser-known labels, for example, and that Apple "should have" suspected

8   that the sound recordings at issue were unauthorized because they are old and other versions of them

9   were available in the iTunes Store.  *Neither* of these assertions is relevant to the willfulness inquiry.

10      As courts have recognized, "should have known" reflects a "negligence standard"—not a

11  willful blindness standard.  *Erickson Prods.*, 921 F.3d at 833 (rejecting a "should have known"

12  framework for the willfulness inquiry); *King Records, Inc. v. Bennet*, 438 F. Supp. 2d 812, 862 (M.D.

13  Tenn. 2006) (fact that defendants "could have been more diligent in purchasing music product from

14  third parties . . . amount[s] to negligence and nothing more*).*  And companies cannot be charged with

15  willfulness simply because they are large and sophisticated, and allegedly should have known better.

16  *See Zillow*, 918 F.3d at 749 (rejecting argument that Zillow's status as a "sophisticated business with

17  a robust legal team" meant that it should have known that its agreements with its feed providers were

18  invalid).  Any argument that Apple could or should have done more to investigate the bases for the

19  Content Providers' representations and warranties cannot create a disputed issue of fact on willfulness

20  for purposes of this Motion.

21      Not only are Plaintiffs' anticipated "should have known" theories irrelevant as a legal matter,

22  they lack factual merit too.  "The fact that a recording of a composition was uploaded previously does

23  not indicate that the next upload is infringing."  Ex. 4 ¶ 44; *see also id.* ¶¶ 43–48; Ex. 17 195:4–19

24  (testifying that it is common to have more than one properly licensed version of a sound recording in

25  the iTunes Store because sound recordings can appear on different albums of different content

26  providers, or different albums of the same content provider).  Apple also does not have insight into the

27  licenses that a rightsholder may have granted third parties to distribute its content.  It is plausible that

28  a record label obtained the rights to distribute a sound recording from its original owner—this practice

occurs all the time and is contemplated by the Copyright Act.  *See* 17 U.S.C. § 115(a)(1)(B).  In fact, the old age of the sound recordings at issue indicates that, due to years of licensing and record label acquisitions, multiple content providers likely had authority to distribute that same content.

In short, the undisputed facts demonstrate Apple reasonably believed it possessed the necessary authorizations to offer the sound recordings at issue for sale in the iTunes Store—and thus, no reasonable juror could conclude that Apple engaged in willful infringement with respect to the underlying musical compositions.  The Court should grant Apple summary judgment on Plaintiffs' willfulness claims for this reason alone.

> ### b.  Apple's Notice And Takedown Procedure Further Establishes That Apple Was Not Willfully Blind To The Alleged Infringement

In addition to reasonably relying on the agreements with the Content Providers (which itself should be dispositive of Plaintiffs' willfulness claims), Apple's notice and takedown procedure further demonstrates that any alleged infringement was not willful.

In evaluating claims of willful copyright infringement, courts consider whether a defendant has a system in place for removing potentially infringing content from its platform—holding that the existence of such a system militates against a finding of willfulness.  In *Zillow*, the Ninth Circuit held that where a defendant was willing to engage in a notice and takedown process, but the plaintiffs filed suit without using that process, infringement was not willful as a matter of law.  918 F.3d at 749.  The plaintiff in that case waited at least a year to "raise the specter of infringement," at which point Zillow activated its notice and takedown procedure and requested further information from the plaintiff.  *Id.*  But "[i]nstead of providing helpful information" in response to Zillow's inquiries, the plaintiff "then filed suit" without meaningfully availing itself of Zillow's notice and takedown procedure.  *Id.*  Thus, "substantial evidence" disproved that Zillow had actual knowledge of or was willfully blind to the alleged infringement.  *Id.*  Similarly, in *Atari*, the court held that the defendant was entitled to summary judgment on willfulness, in part because the defendant "promptly removed infringing listings" from its platform.  515 F. Supp. 3d at 1116–17; *see also Ventura Content, Ltd. v. Motherless, Inc.*, 2013 WL 11237204, at *11 (C.D. Cal. July 3, 2013) (holding that the defendant was not willfully blind to infringement where it had a system for "delet[ing] the identified content" in takedown notices), *aff'd*,

885 F.3d 597 (9th Cir. 2018).

Apple's notice and takedown process is consistent with those discussed in these cases.  After receiving a notice of potential infringement, Apple promptly informs the content provider that supplied the content at issue.  Ex. 19 at 26:8–27:2, 83:9–14.  Upon receipt of the notice, the content provider generally removes the contents.  If the content provider does not respond within five business days, Apple removes the content from the iTunes Store itself.  *Id*. at 90:1–5.  Adasam, Pickwick, and Genepool all routinely and promptly removed content when Apple informed them it had received notice from a third party alleging that the content was unauthorized.  *See, e.g.*, Ex. 29 (Adasam: "Kindly note that we have removed these sound recordings notified to us from sale while we investigate this claim."); Ex. 30 (Pickwick: "We agree to relinquish US rights in this recording and have amended our records accordingly."); Ex. 31 (Genepool:  "I have removed these from U.S. Territories"); *see also* Ex. 32 (Genepool's director explaining that, upon receipt of a takedown request, it "immediately remove[d] the content at issue to avoid a dispute," and not because "it knows or believes the content is infringing"); Cook Decl. ¶¶ 6, 8, 10.  Apple's notice and takedown system protects the interests of copyright owners. *See* Ex. 18 (providing dispute form for copyright owners to use if they believe content in the iTunes Store "is in violation of your intellectual property rights"); Ex. 19 at 14:18–15:23, 18:5–19 (describing process for addressing "third party copyright disputes").  This precludes a finding of willful infringement.

### c.    Apple's Notice And Takedown System Is Not Evidence Of Willfulness

Throughout this litigation, Plaintiffs have attempted to turn Apple's notice and takedown process around on Apple, arguing that because Apple received takedown notices for music provided by the Content Providers at issue here, Apple's notice and takedown system—which allows it to quickly *remove* allegedly infringing music from the iTunes Store—is actually evidence of willful copyright infringement.  Plaintiffs are wrong for several reasons.

### (i)    Evidence Of Unrelated Takedown Notices And Other Litigation Is Irrelevant and Inadmissible

As a threshold matter, evidence that Apple received takedown notices concerning sound recordings that are not at issue in these cases is inadmissible and should be not be considered on this

Motion. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (only admissible evidence can be evaluated by the court in determining whether there is a genuine issue of material fact). Plaintiffs have pointed to takedown notices Apple received from unrelated third parties regarding sound recordings that are not at issue in these cases. Their argument seems to be that because Apple sold (allegedly) infringing music in the iTunes Store in the past, it must have been intentionally selling infringing music in these cases. But "prior acts" evidence is not admissible to show behavior in conformity with a propensity or character trait. Fed. R. Evid. 404.

In *Dallas Buyers Club, LLC v. Doughty*, the court held on a motion for summary judgment that evidence that the defendant was "allegedly a past infringer and thus [was] likely an infringer in this case" was inadmissible. 2016 WL 1690090, at *2 (D. Or. Apr. 27, 2016). The court "disregard[ed] any use of evidence by Dallas which attempt[ed] to insinuate Doughty's alleged past character traits tend[ed] to prove he is likely an infringer in this case." *Id.*; *see also Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 12597433, at *4 (C.D. Cal. Oct. 31, 2014) ("Evidence that a defendant was willfully blind as to infringing content collateral to the litigation [was] irrelevant to prove the specific acts of infringement alleged in this case." (citation omitted)).

Similarly, any evidence concerning the *Blagman* lawsuit and subsequent takedown notices are inadmissible for purposes of the willful infringement inquiry. For one thing, the *Blagman* lawsuit is irrelevant. The *Blagman* suit and related takedown notices did not even concern either of the Content Providers at issue in *Genepool* (Ideal and Genepool)—and thus is plainly irrelevant to Apple's conduct in connection with any content it received from Genepool. And even though the *Blagman* lawsuit involved the Content Providers at issue in the *Adasam* and *Pickwick* cases, the *Blagman* lawsuit was brought by a *different* plaintiff and concerned *different* copyrights and works; ███████████████ ████████████████████████████████ likewise concerned the rights of *that* plaintiff—not the rights of the Plaintiffs in the *Adasam* and *Pickwick* cases. Evidence of the separate *Blagman* lawsuit and ████████████████████ simply has no bearing on whether Apple knew of or was willfully blind to the alleged infringement asserted by *these* Plaintiffs in *these* cases. The evidence is inadmissible on this basis and should have no bearing on this Motion.

Even if evidence concerning the *Blagman* lawsuit and related takedown notices was considered

relevant (it is not), it would still be inadmissible as improper character evidence under Fed. R. Evid. 404(b)—and thus cannot be considered on this Motion for that additional reason.  Here, Plaintiffs intend to offer the *Blagman* evidence to suggest to the jury that Apple is a repeat infringer that permits piracy to run rampant on its iTunes Store.  This is a textbook violation of Rule 404(b).  Evidence that a defendant was willfully blind "as to infringing content collateral to the litigation" is "classic inadmissible character evidence." *Giganews*, 2014 WL 12597433, at *4–5 (excluding evidence of general infringement across the defendant's servers on this basis).  Evidence of the *Blagman* lawsuit and related takedown notices should not be considered on this Motion.

Plaintiffs' reliance on takedown notices for tracks delivered to Apple by one Content Provider to establish that Apple willfully infringed with respect to tracks provided by a *different* Content Provider is similarly misplaced.  A finding of willful copyright infringement requires that the defendant "was actually aware of the infringing activity" or that the defendant's "actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights." *Zillow*, 918 F.3d at 748. Willful blindness requires a showing that the defendant "was willfully blind to the specific instances of infringement at issue in the case, and not just to copyright infringement generally." *Davis v. Pinterest, Inc.*, 2021 WL 879798, at *3 (N.D. Cal. Mar. 9, 2021) (citing *Luvdarts*, 710 F.3d at 1073); *see also Zillow*, 918 F.3d at 748 ("Reckless disregard can be demonstrated" when a party refuses "to even investigate or attempt to determine whether *particular* [photos] are subject to copyright protections." (emphasis added) (alteration in original)).  There is no reason that an allegation that one Content Provider violated a copyright holder's rights would have made Apple aware of (or willfully blind to) an act of infringement by a *different* Content Provider.  And even if takedown notices are indicative of Apple's state of mind—and they are not, for the reasons discussed below—Apple's state of mind with respect to one Content Provider's music cannot create a genuine issue of material fact about Apple's state of mind with respect to a completely different Content Provider's music.  Thus, evidence that Apple received takedown notices for sound recordings delivered by Adasam is utterly irrelevant to the question of whether it was actually aware of, or willfully blind to, infringing conduct by Genepool or Pickwick (and vice versa).

### (ii)   Unrelated Takedown Notices And Other Litigation Do Not Create A Triable Issue Of Fact Regarding Willfulness

Even if evidence regarding unrelated takedown notices and the *Blagman* suit is deemed admissible, such evidence does not raise a triable question of fact with regard to willfulness for at least two reasons.

*First*, that Apple receives a takedown notice for a given sound recording does not mean the sound recording is in fact unauthorized. Anyone can submit a takedown notice—regardless of whether they actually own the rights asserted—and good-faith disputes between claimants and content providers as to whether content is properly licensed are common. Further, even if the content provider did not have authorization to exploit the *sound recording*, that does not necessarily mean the content provider lacked a license to the underlying *composition*. Nonetheless, to protect against the possibility of infringement, Apple promptly removes from the iTunes Store sound recordings that are the subject of takedown notices, unless the content provider affirmatively asserts rights to the content. This copyright-protective practice demonstrates that Apple did *not* willfully infringe as a matter of law. *See Ventura Content*, 2013 WL 11237204, at *11 (concluding the defendant was not willfully blind where the defendant deleted content identified in takedown notices).

*Second*, that Apple receives takedown notices for content delivered by lesser-known labels does not mean those labels must be "pirates," as Plaintiffs have suggested throughout these cases. Small labels can own or license music, just as established labels can be wrong about their rights. As Apple's 30(b)(6) witness testified, Apple receives numerous takedown requests for content provided by the major labels—i.e., Universal Music, Sony Music, and Warner Music Group. Ex. 19 at 161:15–162:4. The size or notoriety of a label tells Apple nothing about the ownership of a sound recording or musical composition, and therefore cannot be the basis for a willfulness finding.

\*     \*     \*

Genuine issues of material fact exist as to the question of copyright infringement. *See infra* n.11. But based on the records in these three cases, no reasonable jury could find that any alleged infringement by Apple was willful. Plaintiffs' *willful* claims should be dismissed now.

**B.      Plaintiffs' Infringement Claims Based On Alleged Promotional Clips And A "Making Available" Theory Of Liability Fail**

Two of Plaintiffs' theories of copyright liability also should be dismissed on summary judgment.  To hold Apple liable for copyright infringement, Plaintiffs must show that:  (i) they own valid copyrights in the Subject Compositions; and (ii) Apple's conduct with respect to the Subject Compositions infringed those copyrights, i.e., that it violated at least one of the exclusive rights enumerated in 17 U.S.C. § 106.  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). No reasonable jury could find for Plaintiffs on two of their infringement theories:  (i) Plaintiffs' theory that Apple infringed their purported copyrights in the Subject Compositions by reproducing and distributing copies of recordings embodying the Subject Compositions as promotional clips on iTunes, in violation of their reproduction and distribution rights under 17 U.S.C. §§ 106(1) and 106(3); and (ii) Plaintiffs' theory that Apple infringed their purported copyrights by making available sound recordings embodying the Subject Compositions in the U.S. iTunes Store, in violation of their distribution right under 17 U.S.C. § 106(3).

Plaintiffs' claims based on alleged promotional clips fail because Plaintiffs have not met and cannot meet their burden of demonstrating which, if any, of the Subject Compositions were streamed as promotional clips.  And Plaintiffs' "making available" theory is not a legally cognizable premise for a distribution right violation under the law.  The Court should grant Apple summary judgment on these two theories of copyright infringement. *See, e.g.*, *SA Music v. Amazon*, 2020 WL 3128534, at *1 (W.D. Wash. June 12, 2020) (dismissing one of multiple liability theories underlying copyright infringement claim); *Applied Bus. Software, Inc.*, 2019 WL 1949455, at *5–10 (granting partial summary judgment on one of multiple legal theories underlying a single copyright infringement claim).[11]

---

[11] Plaintiffs also allege infringement based on Apple's purported (i) importation of permanent downloads embodying the Subject Compositions, in violation of 17 U.S.C. §§ 106(3) and 602; and (ii) reproduction and distribution of permanent downloads of sound recordings embodying the Subject Compositions, including on Apple's servers, in violation of 17 U.S.C. §§ 106(1) and 106(3).  While Apple does not seek summary judgment on these infringement theories, Apple maintains that there are genuine issues of material fact with respect to whether the alleged infringement occurred that would preclude summary judgment in Plaintiffs' favor—including (i) whether Apple's alleged conduct in reproducing and distributing server copies constitutes direct infringement; (ii) whether Plaintiffs' claims based on that conduct are barred with respect to sound recordings that were not sold during the applicable three-year statute of limitations; and (iii) whether the sound recordings were imported into the United States at all.

1.      **The Court Should Grant Apple Summary Judgment on Plaintiffs' Infringement Claims Based On Alleged Promotional Streams**

Plaintiffs assert that Apple reproduced and distributed copies of the recordings embodying the Subject Compositions as promotional streams in the iTunes Store, in violation of their reproduction and distribution rights under sections 106(1) and 106(3) of the Copyright Act.  But Plaintiffs have failed to produce copies of the allegedly infringing promotional clips.  Their infringement claims based on promotional clips cannot survive summary judgment as a result.

Courts "require[] the non-moving party with the burden of proof in copyright cases to produce the alleged infringed and infringing products for comparison purposes at the summary judgment stage." *Berkla v. Corel Corp.*, 66 F. Supp. 2d 1129, 1139-40 & n.11 (E.D. Cal. 1999) ("Since [plaintiff] bears the burden of production, he will bear the result of non-production."); *see also Nakada + Assocs., Inc. v. City of El Monte*, 2017 WL 2469977, at *4 (C.D. Cal. June 2, 2017) (holding that on summary judgment, plaintiffs "must establish a *prima facie* case for copyright infringement against [d]efendant.").  That is because "[t]here can be no proof of . . . copyright infringement unless [the plaintiff's] works are juxtaposed with [the allegedly infringing works] and their contents compared." *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986).

Here, Plaintiffs produced no evidence whatsoever as to which, if any, of the Subject Compositions were streamed as promotional clips in the iTunes Store.  They did not produce copies of the allegedly infringing clips, nor any testimony supporting their allegation that clips of the Subject Compositions were streamed in the iTunes Store.  And they have not identified which Subject Compositions (if any) they contend were the subject of the allegedly infringing promotional clips.  This is fatal to Plaintiffs' claims based on promotional clips.

In *Richardson v. CBS Studios Inc.*, for example, the plaintiffs alleged infringement of their copyrights in musical works that they asserted were used in episodes of a television show without authorization.  2013 WL 12120265, at *1–2 (C.D. Cal. Sept. 25, 2013).  "Rather than produce the actual . . . episodes in which they claim their copyrights were infringed together with the copyrighted works," the plaintiffs submitted declarations "recount[ing] their review of certain [of the] episodes." *Id.* at *5.  The court concluded that the plaintiffs' failure to submit the episodes "in which they claim

their copyrights were infringed" precluded the existence of "a genuine dispute of material fact" as to the defendant's copying of the works at issue. *Id.* at *5–6. Here, not only did Plaintiffs similarly fail to produce the promotional clips "in which they claim their copyrights were infringed," *id.* at *5, they also did not elicit any testimony to identify which, if any, compositions were ever streamed as promotional clips. Plaintiffs' failure to do so precludes the existence of "a genuine dispute of material fact" as to whether Apple streamed unauthorized promotional clips. *Id.* at *6.

Plaintiffs may make much of the fact that they sought in discovery from Apple a list of sound recordings embodying the Subject Compositions that were streamed as promotional clips in the iTunes Store. But in response to that request, Apple explained that it does not possess such records. That does not absolve Plaintiffs of their burden to "present affirmative evidence in order to defeat" a motion for summary judgment. *Anderson*, 477 U.S. at 257. "This is true even where the evidence is likely to be within the possession of the defendant"—here, Apple explained that it is not—"so long as the plaintiff had a full opportunity to conduct discovery," which Plaintiffs in these cases cannot dispute. *Id.* The bottom line is that Plaintiffs have failed to make out a *prima facie* case of copyright infringement against Apple with respect to promotional streams as a result of their failure to produce the allegedly infringing promotional streams. Summary judgment should be granted in Apple's favor on Plaintiffs' copyright infringement claims based on promotional streams as a result.

## 2.   The Court Should Grant Apple Summary Judgment On Plaintiffs' Infringement Claims Based On A Rejected "Making Available" Theory of Liability

Plaintiffs also assert that Apple infringed their copyrights by "making available recordings of the Subject Compositions . . . for permanent downloads and promotional streams on iTunes" in violation of section 106(3) of the Copyright Act. Summary judgment must be granted to Apple on this theory of liability, because it is not cognizable under hornbook copyright law and .

To state a claim for copyright infringement, Plaintiffs must allege that Defendants violated one of the exclusive rights enumerated in section 106 of the Copyright Act. 17 U.S.C. § 106. Section 106 does not establish any exclusive right to make a copyrighted work available; it provides for exclusive rights to reproduce, distribute, perform, display, and prepare derivative works based on copyrighted works. *Id.* Thus, multiple courts have held that a "making available" copyright claim is not cognizable.

1    In *Zillow*, the Ninth Circuit rejected a "making available" claim in the public display context on the

2    ground that such a claim was not "supported by the [copyright] statute."  918 F.3d at 736.

3         In an effort to tie their "making available" claim to the language of section 106, Plaintiffs assert

4    that by making the Subject Compositions available for sale in the iTunes Store, Apple infringed their

5    "exclusive distribution rights."  No. 20-cv-2965-WHO, Dkt. 45 ¶ 132 (citing 17 U.S.C. § 106(3)), No.

6    20-cv-02146-WHO, Dkt. 34 ¶ 107 (citing 17 U.S.C. § 106(3)); No. 20-cv-02794-WHO, Dkt. 66 ¶ 123

7    (citing 17 U.S.C. § 106(3)).  But binding authority holds that under section 106(3) of the Copyright

8    Act, "distribution" requires "'actual dissemination' of a copy."  *Perfect 10, Inc. v. Amazon.com, Inc.*,

9    508 F.3d at 1146, 1162 (9th Cir. 2007) (holding that the district court's conclusion that "distribution"

10   requires "actual dissemination" was "consistent with the language of the Copyright Act"); *In re*

11   *Napster, Inc. Copyright Litig.*, 377 F. Supp. 2d 796, 805 (N.D. Cal. 2005) (rejecting theory that "any

12   offer to distribute a copyrighted work violates section 106(3)" based on Copyright Act's text and

13   legislative history); *see also Nat'l Car Rental Sys., Inc. v. Comput. Assocs. Int'l, Inc.*, 991 F.2d 426,

14   434 (8th Cir. 1993) (adopting leading copyright law scholar's view that "'[i]nfringement of [the

15   distribution right] requires an actual dissemination of either copies or phonorecords.'" (alterations in

16   original) (quoting 2 Melville B. Nimmer, *Nimmer on Copyright* § 8.11[A], at 8-124.1 (1993))).  This

17   means that the alleged infringer must disseminate a copy of the purportedly infringing work "by sale

18   or other transfer of ownership, or by rental, lease, or lending," to be held liable for violating a copyright

19   holder's exclusive distribution right.  *Perfect 10*, 508 F.3d at 1162.  Merely "making" a copyrighted

20   work "available" for sale is not enough.  *Id.* (rejecting plaintiffs' argument that "merely making images

21   'available' violates the copyright owner's distribution right"); *EVOX Prods., LLC v. Verizon Media*

22   *Inc.*, 2021 WL 3260609, at *2–3 (C.D. Cal. May 5, 2021) (granting judgment on the pleadings on the

23   plaintiff's claim that the defendants infringed their copyright in certain photographs by "mak[ing] the

24   photographs accessible to the public"); *Atl. Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 983 (D.

25   Ariz. 2008) ("[t]he majority of district courts have rejected the . . . 'making available' theory"); *cf.*

26   *Zillow*, 918 F.3d at 736 (rejecting the "making available" theory in the context of the Copyright Act's

27   public display right under section 106(5)).

28        Apple's mere "making available" for sale sound recordings in the iTunes Store embodying the

Subject Compositions is not a dissemination "by sale or other transfer of ownership." *Perfect 10*, 508

F.3d at 1162.  A court in this Circuit presiding over cases brought by the *same* Plaintiffs against another

major digital retailer recently held precisely that in a nearly identical context.  In *SA Music v. Amazon*,

Plaintiffs alleged that Amazon infringed their purported copyrights in musical compositions by offering

for sale sound recordings embodying those compositions as permanent downloads through Amazon's

digital music store.  2020 WL 3128534, at *1–2.  After surveilling the abundant case law squarely

rejecting similar "making available" theories of liability—and finding that "[t]he Ninth Circuit

consistently requires that an actual distribution occur"—the court concluded that Plaintiffs could not

hold Amazon liable under section 106(3) of the Copyright Act for making sound recordings available

to the public.  *See id.* at *5–7 (collecting cases).  The court "conclude[d] that distribution of a

copyrighted work under § 106(3) requires 'actual dissemination' of the copyrighted work and, in the

context of a digital music store, actual dissemination means the transfer (or download) of a file

containing the copyrighted work from one computer to another." *Id.* at *7.  It accordingly dismissed

Plaintiffs' "making available" theory of liability. *Id*.

This Court should do the same.  Apple's mere offering for sale sound recordings embodying

the Subject Compositions cannot on its own give rise to a claim of copyright infringement under

section 106(3) of the Copyright Act.  The Court should grant Apple summary judgment on Plaintiffs'

infringement claims based on such a rejected "making available" theory of infringement.

## CONCLUSION

For the foregoing reasons, the Court should grant Apple summary judgment on Plaintiffs'

claims that Apple's alleged infringement was willful.  The Court also should grant Apple summary

judgment on Plaintiffs' copyright infringement claims based on promotional streams and a "making

available" theory of infringement.

Dated: November 23, 2021

GIBSON, DUNN & CRUTCHER LLP

By:   /s/ *Scott A. Edelman*
Scott A. Edelman
Gabrielle Levin
Ilissa Samplin

Attorneys for Defendant APPLE INC.