Matthew F. Schwartz * *Pro Hac Vice*
Brian S. Levenson * *Pro Hac Vice*
SCHWARTZ, PONTERIO & LEVENSON, PLLC
134 West 29th Street, Suite 1001
New York, New York 10001
Phone: (212) 714-1200
E-mail: blevenson@splaw.us
E-mail: mschwartz@splaw.us

Oren S. Giskan * *Pro Hac Vice*
GISKAN SOLOTAROFF & ANDERSON LLP
90 Broad Street, 10th Floor
New York, New York 10004
Phone: (212) 847-8315
E-mail: ogiskan@gslawny.com

Allen Hyman (California State Bar No. 73371)
LAW OFFICES OF ALLEN HYMAN
10737 Riverside Drive
North Hollywood, CA 91602
Phone: (818) 763-6289
E-mail: lawoffah@aol.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.A. MUSIC, LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., *et al.*,<br><br>Defendants. | Case No. 20-cv-2146-WHO<br>Case No. 20-cv-2794-WHO<br>Case No. 20-cv-2965-WHO |

# PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iv

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

Preliminary Statement ................................................................ 1

Factual Background ................................................................... 3

    A.  Plaintiffs SA Music, LLC and the Harold Arlen Trust .................................. 3

    B. Plaintiff Ray Henderson Music Co., Inc. ........................................ 3

    C. Plaintiff Four Jays Music Company ............................................ 4

    D.  Defendant Apple Inc. ...................................................... 5

    E. The Distributor Defendants .................................................. 5

        1. *Adasam* ............................................................ 5

        2. *The Pickwick Defendants* .............................................. 6

        3. *Genepool Distribution Limited and Ideal Music Limited* ...................... 7

LEGAL ARGUMENT ................................................................. 8

Point I Legal Standard on Summary Judgment ........................................... 8

Point II Plaintiffs Own or Control Exclusive Rights Under Valid Copyrights for Each of the Arlen, Henderson, and Warren Works ................................................. 9

    A.  Applicable Law ........................................................... 9

    B. Undisputed Evidence of Ownership and Valid Copyrights .......................... 10

    C. The Internal Four Jays Dispute .............................................. 12

Point III The Recordings at Issue Embody Plaintiffs' Compositions ........................ 13

Point IV Apple Violated Plaintiffs' Exclusive Rights of Reproduction, Distribution, and Importation ...................................................................... 14

    A.  Reproduction ........................................................... 15

B. Distribution – Making Available ...................................................................16

C.  Distribution - Sales ...................................................................................18

D. Importation ...............................................................................................19

Point V Apple Has No Valid Licenses...............................................................21

A. Apple Has the Burden of Proving its Licensing Affirmative Defense .............21

B. MRI's Section 115 Notices Are Invalid .........................................................22

   *1. Timely Notice* ..............................................................................................22

   *2. Sufficiency of the Notice*..............................................................................24

   *3. Eligibility*....................................................................................................27

C. The Harry Fox Licenses Claimed by Adasam Are Also Invalid ....................31

Conclusion on Liability......................................................................................32

Point VI Apple's Conduct Was Willful ...............................................................32

A. Applicable Law ...........................................................................................33

B. Apple Recklessly Chose Music Pirates as Business Partners .........................35

   *1. Adasam Was Obviously a Pirate*..................................................................36

   *2. Pickwick Was Obviously a Pirate* ................................................................37

   *3. Genepool/Ideal Was Obviously a Pirate* ......................................................38

C.  Apple Received Notices Identifying Thousands of Pirated Recordings..........38

D.  The Blagman Lawsuit and Notice................................................................41

E. Independent Labels Confirm Piracy..............................................................42

F.  Apple's Own Internal Investigation Confirms Piracy ...................................44

G. Apple Had No Policy for Terminating Repeat Infringers................................46

H. Apple Knew *Upon Upload* When Recordings Matched Other Recordings
Already Available For Sale on iTunes And Failed to Inquire or Notify The

Copyright Owners ...................................................................................................46

Conclusion on Willfulness .......................................................................................50

Conclusion................................................................................................................52

# TABLE OF AUTHORITIES

## Cases

*24/7 Records, Inc. v. Sony Music Entm't, Inc.,*
  429 F.3d 39 (2d Cir. 2005)..............................................................22, 24

*A&M Records, Inc. v. Napster, Inc.,*
  239 F.3d 1004 (9th Cir. 2001) ................................................ 8, 9, 17, 18

*ABKCO Music Inc. v. Sagan,*
  2018 WL 1746564 (S.D.N.Y. 2018)........................................................10, 21

*Adobe Sys. Inc. v. Christenson,*
  809 F.3d 1071 (9th Cir. 2015)...................................................................21

*Arista Records LLC v. Lime Wire LLC,*
  2010 WL 10031251 (S.D.N.Y. Aug. 9, 2010)............................................30

*Arista Records LLC v. Myxer Inc.,*
  2011 WL 11660773 (C.D.Cal. Apr. 1, 2011) ............................................30

*Blagman v. Apple, Inc. et. al.,*
  (S.D.N.Y. Dkt. No. 12-cv-5453).................................................................41

*Blagman v. Apple, Inc.,*
  2014 U.S. Dist. LEXIS 45401 ............................................................23, 28

*BMG Rights Management (US) LLC v. Global Eagle Entertainment Inc.,*
  2019 WL 6315533 (C.D.Cal 2019).............................................................20

*BMG v. Cox,*
  149 F. Supp. 3d at 646 and n.5 (E.D. Va. 2015)........................................11

*Call v. Badgley,*
  254 F. Supp. 3d 1051 n.5 (N.D. Cal. 2017). ..............................................37

*Capitol Records, LLC v. Escape Media Grp., Inc.,*
  2015 WL 1402049 (S.D.N.Y. 2015)...........................................................30

*Capitol Records, LLC v. ReDigi Inc.,*
  934 F. Supp. 2d 640(S.D.N.Y. 2013).........................................................15

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986). ....................................................................................8

*Cherry River Music Co. v. Simitar Entm't, Inc.,*
  38 F. Supp. 2d 310 (S.D.N.Y. 1999)..........................................................23

*Davidson v. United States,*
  138 Fed.Ct. 159 (Fed Claims 2018) ...........................................................21

*Davis v. Blige*,
  505 F.3d 90 (2d Cir. 2007)................................................................................32

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)..........................................................................................16

*Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*,
  697 F.2d 27 (2d Cir. 1982)................................................................................11

*Educ. Testing Serv. v. Simon*,
  95 F. Supp. 2d 1081 (C.D. Cal. 1999). ..............................................................9

*EMI Entm't World, Inc. v. Karen Records, Inc.*,
  603 F. Supp. 2d 759 (S.D.N.Y. 2009)...............................................................31

*Enterprises Intern., Inc. v. International Knife & Saw, Inc.*,
  2014 WL 3700952 (W.D.Wa 2014) .................................................................17

*Erickson Productions, Inc. v. Kast*,
  2021 WL 3856698 (N.D.Cal 2021) ..................................................................34

*Erickson Productions, Inc. v. Kast*,
  921 F.3d 822 (9th Cir. 2019)............................................................................34

*Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*,
  499 U.S. 340 (1991)............................................................................................8

*Fitzgerald Publishing Co. v. Baylor Publishing Co.*,
  807 F.2d 1110(2d Cir. 1986).............................................................................34

*Friedman v. Live Nation Merchandise, Inc.*,
  833 F.3d 1180(9th Cir. 2016)...........................................................................34

*Harris v. Emus Records Corp.*,
  734 F.2d 1329 at n.2 (9th Cir. 1984)...............................................24, 25, 28, 31

*Harry Fox Agency, Inc. v. Mills Music, Inc.*,
  720 F.2d 733(2d Cir. 1983)..............................................................................31

*Hart v. Sampley*,
  Civ. A. No. 91-3068 (CRR), 1992 WL 336496 (D.D.C. June 24, 1992) ..........11

*Island Software and Computer Serv., Inc. v. Microsoft Corp.*,
  413 F.3d 257(2d Cir. 2005)..............................................................................10

*Kihn v. Bill Graham Archives, LLC*,
  445 F.Supp.3d 234(N.D.Cal. 2020)..................................................................21

*L'Anza Research Intern., Inc. v. Quality King Distributors, Inc.*,
  98 F.3d 1109 (9th Cir. 1996).............................................................................16

*Lanard Toys Limited v. Novelty, Inc.*,
  2008 WL 11333941 (C.D.Cal. 2008).............................................................34, 51

*Lanard Toys Limited v. Novelty, Inc.*,
  2010 WL 1452527 (9th Cir. 2010)........................................................ 34, 35, 50, 51

*Laws v. Sony Music Entm't, Inc.*,
  448 F.3d 1134(9th Cir. 2006)............................................................................17

*Lipton v. Nature Co.*,
  71 F.3d 464(2d Cir. 1995)...............................................................................33

*Magnuson v. Video Yesteryear*,
  85 F.3d 1424 (9th Cir. 1996)............................................................................11

*MAI Sys. Corp. v. Peak Computer, Inc.*,
  991 F.2d 511(9th Cir. 1993).............................................................................15

*Maloney v. T3Media Inc.*,
  853 F.3d 1004 (9th Cir. 2017)...........................................................................16

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574(1986).......................................................................................8

*Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*,
  518 F.Supp.2d 1197 (C.D.Cal.2007) .................................................................30

*Micro Star v. Formgen Inc.*,
  154 F.3d 1107(9th Cir. 1998)...........................................................................10

*Microsoft Corporation v. Buy Cheap Software, Inc.*,
  2016 WL 7444627 (C.D.Cal 2016)................................................................34, 51

*Montgomery County Assoc. of Realtors, Inc. v. Realty Photo Master Corp.*,
  878 F. Supp. 804 (D. Md. 1995) .......................................................................10

*Neman Fin., L.P. v Citigroup Glob. Markets, Inc.*,
  LACV 14-2499-VAP, 2018 WL 6265061 [CD Cal Sept. 5, 2018].....................20

*Norbay Music, Inc. v. King Records, Inc.*,
  249 F.Supp. 285(S.D.N.Y. 1966).......................................................................23

*Palladium Music, Inc. v. Eatsleepmusic, Inc.*,
  398 F.3d 1193(10th Cir. 2005) ........................................................................24

*Parfums Givenchy, Inc. v. C &C Beauty Sales, Inc.*,
  832 F.Supp. 1378(C.D.Cal 1993) .....................................................................16

*Peer Intern. Corp. v. Pausa Records, Inc.*,
  909 F.2d 1332 (9th Cir. 1990)......................................................................35, 50

*Perfect 10, Inc. v. Google*,
  653 F.3d 976(9th Cir. 2011)............................................................................16

*RSO Records, Inc. v. Peri*,
  596 F. Supp. 849(S.D.N.Y. 1984)......................................................................18

*Shapiro, Bernstein & Co. v Remington Records, Inc.*,
  265 F.2d 263 (2d Cir. 1959)..................................................................23, 26

*Sony/ATV Publ'g, LLC v. Marcos*,
  651 F. App'x 482(6th Cir. 2016) ....................................................................32

*T.B. Harms Co. v. Jem Records, Inc.*,
  655 F.Supp. 1575(1987)...................................................................................20

*Three Boys Music Corp. v. Bolton*,
  212 F.3d 477(9th Cir. 2000)...............................................................................8

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
  768 F.2d 1001(9th Cir. 1985)............................................................................9

*U2 Home Entm't, Inc. v. Wei Ping Yuan*,
  245 F. App'x 28, 29 (2d Cir. 2007) .................................................................33

*UMG Recording, Inc. v. Escape Media Grp., Inc.*,
  2014 WL 5089743 (S.D.N.Y. 2014)................................................................30

*UMG Recordings, Inc. v. Grande Communications Networks, LLC*,
  384 F.Supp.3d 743 (W.D.Tex 2019).................................................................30

*UMG Recordings, Inc. v. MP3.com, Inc.*,
  92 F. Supp. 2d 349(S.D.N.Y. 2000)................................................................15

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  718 F.3d 1006(9th Cir.2013)............................................................................30

*UMG Recordings, Inc. v. Sinnott*,
  300 F. Supp. 2d 993(E.D. Cal. 2004)..............................................................18

*UMG Recordings, Inc. v. Stewart*,
  461 F. Supp. 2d 837(S.D. Ill. 2006).................................................................18

*UMG Recordings, Inc. v. Veoh Networks Inc.*,
  665 F.Supp.2d 1099 (C.D.Cal.2009) ...............................................................30

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
  853 F.3d 980(9th Cir. 2017)...........................................................................34

*United States v. Perea-Rey*,
  680 F.3d 1179n.1 (9th Cir. 2012) ....................................................................36

*Video Views, Inc. v. Studio 21, Ltd.*,
  925 F.2d 1010(7th Cir. 1991)...........................................................................34

*Washington Shoe Co. v. A-Z Sporting Goods Inc.*,
  704 F.3d 668(9th Cir. 2012)...................................................................17, 35

*Wildlife Express Corp. v. Carol Wright Sales, Inc.*,
  18 F.3d 502 (7th Cir. 1994)........................................................................9, 35

*X-IT Products, L.L.C. v. Walter Kidde Portable Equipment, Inc.,*
  155 F. Supp. 2d 577(E.D. Va. 2001) ...................................................9, 11

**Statutes**

17 U.S.C. § 101 ...............................................................................................32

17 U.S.C. § 102(a) .............................................................................................9

17 U.S.C. § 106 ........................................................................ 8, 9, 14, 16, 17

17 U.S.C. § 115 ....................................................................................... passim

17 U.S.C. § 410(c) .............................................................................................9

17 U.S.C. § 501(b) .............................................................................................9

17 U.S.C. § 504(c) ...........................................................................................33

17 U.S.C. § 602 ..................................................................................14, 19, 20

**Rules**

37 C.F.R. § 201.18 .............................................................................24, 25, 26

Fed. R. Civ. P. 8(c)(1) .....................................................................................21

Fed. R. Civ. P. 56. .............................................................................................8

Fed. R. Evid. 201 ........................................................................................11, 21

**Other Authorities**

Nimmer on Copyright ................................................................................ passim

U.S. Copyright Office, The Making Available Right in The United States at p. 74
  (Feb. 2016) ("Copyright Office Report") ...............................................16

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

> If copyright dies, if patents die, if the protection of intellectual property is eroded, then people will stop investing. That hurts everyone. People need to have the incentive so that if they invest and succeed, they can make a fair profit. But on another level, it's just wrong to steal. Or let's put it this way: it is corrosive to one's character to steal. We want to provide a legal alternative.

Steve Jobs, Rolling Stone interview, December 2003

Plaintiffs are family-owned music publishers operated by the heirs of three of most important composers of popular music in the 20th Century – Harold Arlen, Harry Warren, and Ray Henderson. Plaintiffs' musical works include the most iconic and culturally important works of the 20th Century including *That's Amore*, *I've Got the World On a String*, *Come Rain or Come Shine*, *Stormy Weather*, *Bye Bye Blackbird*, *Life Is Just A Bowl of Cherries*, and *Get Happy*.

Apple sold pirated copies of recordings of these works in its iTunes store. The recordings of these monumental musical works that were pirated include every popular recording artist of the 20th Century including, Frank Sinatra, Tony Bennett, Dean Martin, Ray Charles, Ella Fitzgerald, Billie Holiday, Judy Garland, Miles Davis, John Coltrane, Nat "King" Cole, Benny Goodman, Sarah Vaughan, Count Basie, Louis Armstrong. How could Apple possibly think that these famous recordings were owned by Adasam, Pickwick and Genepool, entities that Apple had never even heard of? By selling pirated copies of these works, Apple not only stole money from Plaintiffs for their songs, but also stole royalties owed to these legendary artists and their families for their performances on the recordings as well as the record companies that invested in creating these recordings – these are quite literally, national treasures. Apple pocketed its share and paid the rest to known European music pirates – Adasam, Pickwick and Genepool – purported "record labels" from whom Apple contracted to receive these pirated recordings.

Apple wanted to be the dominant market player in digital music. If that meant it had insufficient time to clear licenses, so be it. But it is even worse – at every turn, Apple made choices that allowed these suppliers to continue to upload pirated recordings. It had the technology to detect these unauthorized recordings, but it chose not to use it. Apple did no due diligence before allowing these pirates to upload these recordings to iTunes. None.

And then it ignored warning after warning that these suppliers were pirates who could not possibly have owned these recordings.  Apple was warned by the major record labels that they did not authorize these recordings. They were warned by music publishers that they did not license these recordings. Apple was warned by the RIAA that these recordings were pirated. Apple was evenly previously sued for selling tracks supplied by Adasam and Pickwick. Even Apple's own outside counsel warned Apple these tracks were pirated! Astonishingly, none of that was enough for Apple to stop doing business with these suppliers of pirated music.

Instead, Apple chose to blindly and unreasonable rely on boilerplate "representations and warranties" from these unknown suppliers that Apple put in to its standard contract, and continued to rely on those representations and warranties after it was obvious that those representations and warranties were false. This is what vast, willful copyright infringement looks like.

As shown below, Plaintiffs demonstrate:

      1.    They are the copyright owners of the compositions at issue (Section 2 below)

      2.    The recordings at issue embody the compositions owned by Plaintiffs (Section 3 below);

      3.    Apple reproduced, distributed and imported the recordings (Section 4 below);

      4.    Apple had no valid licenses to reproduce, distribute and import

the recordings embodying Plaintiffs' compositions (Section 5 below); and

5.      Apple's infringement was willful (Section 6 below).

Summary judgment on the issues of infringement and willfulness should be granted. The Court should order a trial on the limited issue of the damages to be assessed.

## Factual Background

### A.    Plaintiffs SA Music, LLC and the Harold Arlen Trust

SA Music, LLC is the copyright owner of Harold Arlen's catalog of musical works and is operated by Arlen's only child, Sam. Since 1986, Sam has been publishing Harold Arlen's works and preserving his legacy. The Harold Arlen Trust was created by Harold Arlen in his will and is the copyright owner of a catalog of Arlen's earliest works.

Harold Arlen is one of the greatest composers of the 20th Century. Arlen was active in Hollywood and composed the music for some of the greatest film musicals of all time, most notably all the music in the 1939 motion picture classic "The Wizard of Oz," including *Ding, Dong! The Witch Is Dead*, *We're Off To See The Wizard*, and *Over The Rainbow*, which won the Academy Award for Best Original Song and was voted number one on the "Songs of the Century" list compiled by the Recording Industry Association of America and the National Endowment for the Arts. Arlen wrote some of the most celebrated musical works in the Great American Songbook including *Stormy Weather*, *I've Got The World On A String*, *Come Rain Or Come Shine*, *The Devil And The Deep Blue Sea*, and *It's Only A Paper Moon*. Arlen was inducted into the Songwriters Hall of Fame in 1971.

### B.    Plaintiff Ray Henderson Music Co., Inc.

Ray Henderson Music Co., Inc. (Ray Henderson Music) is the copyright

owner of a catalog of Ray Henderson's musical works and is owned and operated by all eight of Ray Henderson's grandchildren. Ray Henderson Music has been publishing the Henderson catalog since 2001. Before the company was created by Henderson's three children, they published the Henderson catalog as a partnership doing business as Ray Henderson Music Co. since the 1980s.

Ray Henderson is one of the greatest composers of the early 20th century. Henderson was a major contributor to the Great American Songbook, having written such songs as *Bye Bye Blackbird, I'm Sitting on Top of the World, Life Is Just a Bowl of Cherries, The Best Things in Life Are Free,* and *Animal Crackers in My Soup*. In 1956, Henderson's songwriting life was the subject of a film called "The Best Things In Life Are Free" starring Gordon MacRae, Dan Dailey and Ernest Borgnine as the real-life songwriting team of Buddy DeSylva, Lew Brown and Ray Henderson. Henderson was among those selected for the inaugural induction of the Songwriters Hall of Fame in 1970.

**C.     Plaintiff Four Jays Music Company**

Four Jays Music Company is the copyright owner of many of Harry Warren's musical works. Formed by Warren in 1955, he named the company after the four "J's" that he loved – his wife Josephine, his daughter Joan, and his granddaughters Julia and Jophe. The company has been owned by his two granddaughters, Julia and Jophe since 1996.

Harry Warren is one of the great composers of 20th century American popular music. Warren was nominated for the Academy Award for Best Song eleven times and won three Oscars for composing *Lullaby of Broadway*, *You'll Never Know*, and *On the Atchison, Topeka and the Santa Fe*. Warren wrote the music for the 1933 film musical, 42nd Street, and over the course of his career, he wrote 81 top 10 hits, including timeless classics such as *At Last, I Only Have Eyes For You*, *That's Amore*, *You Must Have Been A Beautiful Baby*, *Jeepers Creepers*, and *The Gold*

1  *Diggers' Song (We're in the Money)*. Warren's songs have been featured in over
2  300 films. Warren was inducted into the Songwriters Hall of Fame in 1971.

3  **D.    Defendant Apple Inc.**

4      Apple, Inc. ("Apple") is a is an American multinational technology company
5  headquartered in Cupertino, California, that designs, develops, and sells consumer
6  electronics, computer software, and online services. Apple is the most valuable public
7  U.S. company. Apple is currently valued at over $2 trillion.

8      Apple owns and operates the U.S. iTunes Store ("iTunes"), a digital music
9  store that sells permanent downloads. iTunes opened in April 2003 and has been the
10 largest music vendor in the United States since April 2008 and the largest music
11 vendor in the world since February 2010. As of January 2017, the iTunes Store
12 offered between 35–40 million recordings for download.

13 **E.    The Distributor Defendants**

14     All of the distributor defendants have defaulted in appearing. The following
15 is a brief description of each.

16     *1.    Adasam*

17     Adasam Limited ("Adasam") is company formed in 2001 in the United
18 Kingdom. Schwartz Decl., Exh. 61. It is owned by Gerald Palmer and gave Apple a
19 business address at the Allbrite Building on Darley Dale Road in Corby
20 Narthamptonshire, England. Schwartz Decl., ¶ 49 Exh. 52 (Tab 002). Here is a
21 photo of the Adasam/Allbrite facility from which one can obtain, "a range of
22 chemicals and hand care products for any and every cleaning task,"[1] as well as
23 classic and timeless works from some of the musical world's greatest recording
24 artists, including Frank Sinatra, Louis Armstrong and Ella Fitzgerald:

25

26

---
27 [1] See Allbrite's website:  http://www.allbriteservicegroup.com/index_html#services

28



Schwartz Decl., ¶ 61, Exh. 66.

████████████████████████████████████████████████████████

████████████████████ Schwartz Decl., Exhs. 46, 52. Apple received over 3,000 takedown notices for tracks delivered by Adasam. Schwartz Decl., Exh. 14. In January, 2016, Apple received a takedown notice identifying over 11,000 Adasam tracks as unlicensed. Schwartz Decl., ¶ 18, Exh. 20. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Schwartz Decl., Exh. 46 (Apple Interrogatory Response Nos. 14). ████████████████████████████

████████████████████ Schwartz Decl., Exh. 53.

### 2. *The Pickwick Defendants*

Pickwick Group Limited and Pickwick International Limited (collectively, "Pickwick") are both companies formed after 2000 and located in the United Kingdom. Schwartz Decl., Exhs. 64-65. In a 2015 lawsuit in which Pickwick was found to be a copyright infringer, Pickwick's sole shareholder, Raymond Hartley, stated bluntly, "With a lot of Pickwick stuff . . . [w]e avoid licensing . . . It's probably not correct, it's probably not appropriate, but that's the way it was."

1   Schwartz Decl., Exh. 73. 

2   ██████████████████████████████████████████

3   ████████████████████████████ Schwartz Decl., ¶ 54, Exh. 72.

4   █████████████████████████████████████████████

5   ████████████ Schwartz Decl., Exhs. 47, 52. Apple received over 4,000

6   takedown notices for tracks delivered by Pickwick. Schwartz Decl., Exh. 14.

7   █████████████████████████████████████████████

8   █████████████████████████████████████████████

9   ████████████████████████████████. Schwartz Decl.,

10  Exh. 47 (Apple Interrogatory Response Nos. 13-14).

11  █████████████████████████████████████████████

12  ████████████ Schwartz Decl., Exh. 54.

13      **3.    *Genepool Distribution Limited and Ideal Music Limited***

14      Genepool Distribution Limited ("Genepool") and Ideal Music Limited

15  ("Ideal Music") are companies formed in 1999 or later and based in the United

16  Kingdom. Schwartz Decl., Exhs. 62-63. Both are in liquidation. *Id.*

17  █████████████████████████████████████████████

18  █████████████████████████████████████████████

19  ████████████████ Schwartz Decl., ¶ 14, Exhs. 48, 52. Apple received

20  over 1,000 takedown notices for tracks delivered by Genepool for tracks with the

21  Ideal Music ISRC prefix. Schwartz Decl., Exh. 14.

22  █████████████████████████████████████████████

23  █████████████████████████████████████████████

24  ████████████████████████████████. Schwartz Decl.,

25  Exh. 48 (Apple Interrogatory Response Nos. 12-13).

26  █████████████████████████████████████████████

27  ████████████ Schwartz Decl., Exh. 55.

28

1

2  **LEGAL ARGUMENT**

3  **Point I**

4  **Legal Standard on Summary Judgment**

5  A party may move for summary judgment as to a "part of each claim or

6  defense." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the

7  movant shows that there is no genuine dispute as to any material fact and the

8  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

9  moving party must make a showing "sufficient to establish the existence of an

10  element essential to that party's case, and on which that party will bear the burden

11  of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden

12  then shifts to the nonmovant to "come forward with specific facts showing there is a

13  genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

14  475 U.S. 574, 587 (1986). "[S]ummary judgment may be rendered on liability

15  alone.: Fed. R. Civ. P. 56(d)(2).

16  A claim for copyright infringement has just two elements: "(1) ownership of

17  the copyright; and (2) infringement - that the defendant copied protected elements

18  of the plaintiff's work." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th

19  Cir. 2000); see also *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th

20  Cir. 2002) (prima facie case of infringement shown by proving "ownership of the

21  allegedly infringed material" and "demonstrat[ing] that the alleged infringers

22  violate at least one exclusive right granted to copyright holders under 17 U.S.C. §

23  106."); *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361

24  (1991).

25

26

27

28

**Point II**

**Plaintiffs Own or Control Exclusive Rights Under Valid
Copyrights for Each of the Arlen, Henderson, and Warren Works**

Plaintiffs have submitted evidence sufficient to demonstrate that they own a share of each of the works at issue and that the copyright are valid. Other than a family dispute about the percentage interest owned by Four Jays which is the subject of a pending bench trial, there are no material questions of fact as to ownership and the issue should be resolved on summary judgment.

**A.    Applicable Law**

A plaintiff may sue for copyright infringement if it is the "legal or beneficial owner" of the exclusive right (or rights) alleged to have been infringed in the pertinent work. 17 U.S.C. § 501(b); *see also X-It Products, L.L.C. v. Walter Kidde Portable Equipment, Inc.*, 155 F. Supp. 2d 577, 603 (E.D. Va. 2001) (The "copyright owner, or the owner of exclusive rights under the copyright . . . has standing to bring an action for infringement of those rights.").

17 U.S.C. § 102(a) provides that ownership of copyright is automatic once an original work ... has been created. *Educ. Testing Serv. v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D. Cal. 1999). 17 U.S.C. § 106(1) and 106(3) give the copyright owner the exclusive right to distribute his or her work. *Id.* at 1088; see also *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). Copyright registrations are "*prima facie* evidence" of "the facts stated in the certificate." 17 U.S.C. § 410(c). That includes ownership. Such registrations "constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate," including ownership and originality. 17 U.S.C. § 410(c); see *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994) ("A certificate of registration from the U.S. Register of Copyrights constitutes prima facie evidence of the validity of a copyright."); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1019 (9th Cir. 1985); 4 M. & D.

Nimmer, Nimmer On Copyright § 13.01 [A] at 13-7 (2007); see also *Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (court may take judicial notice of the Copyright Office's records). If a plaintiff possesses a copyright registration certificate, 'the only evidence required of the plaintiff to establish prima facie ownership . . . is evidence of plaintiff's chain of title from the original copyright registrant.'" Montgomery County Assoc. of Realtors, Inc. v. Realty Photo Master Corp., 878 F. Supp. 804, 809-10 (D. Md. 1995) (quoting 3 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 13.01[A] (1993)).

**B.      Undisputed Evidence of Ownership and Valid Copyrights**

Plaintiffs are the undisputed owners of the 101 musical works at issue. Arlen Decl., ¶ 10; Kolbert Decl., ¶ 5; Henderson-Kemp Decl., ¶ 11; Riva Decl., ¶ 13-14; Alter Decl., ¶ 2 (Alter Report at p. 12); Exhs. 2, 11, 12. For each of the 101 musical works Plaintiffs have provided a copyright registration and the Catalog of Copyright Entries which raise *prima facie* presumption of validity. Levenson Decl. ¶ 11, Exhs. 2, 11. *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998); *ABKCO Music, Inc. v. Sagan, 2017 WL 3236443*, *4 (S.D.N.Y. 2017). Further, Plaintiffs have provided copyright transfer documents to show their chain of title to the Musical Works. Arlen Decl., ¶ 13; Kolbert Decl., ¶ 8; Henderson Decl., ¶ 14; Riva Decl. ¶18-19; Levenson Decl. ¶ 8, 14-22; Exhs. 2, 11, 12. Plaintiffs have continuously issued licenses for their works in films, television shows, advertisements, and collected royalties from all industry sources including ASCAP and the Harry Fox Agency for decades without any ownership dispute. Arlen Decl., Kolbert Decl., Henderson Decl., Riva Decl. Alter Decl.

Plaintiffs have proven that they own or control a share the exclusive rights under copyright for each of the works at issue. Plaintiffs have submitted copies of registration, renewal, and termination records from the U.S. Copyright Office.

Levenson Decl., Exhs. 2, 11. In addition, Plaintiffs' submission include copies of the entries in the yearly catalogs published by the U.S. Copyright Office as well as online printouts from the Copyright Office website. Levenson Decl., Exhs. 2, 11.[2] For all of Plaintiffs' works, Harold Arlen, Ray Henderson, or Harry Warren was listed as an author on the original copyright filings. To the extent the copyrights were transferred and then terminated, all the relevant documents to the chain of title for each copyrighted composition has been included. The Declaration and Report of Plaintiffs' expert witness Lisa Alter provides a detailed review of the chain of title for each composition as well as a thorough analysis of the issues relating to Plaintiffs' ownership and chain of title. Accordingly, Plaintiffs' prima facie ownership of these works in suit has been established. *See BMG v. Cox*, 149 F. Supp. 3d at 644

The presumption of ownership created by the relevant copyright registration certificates precludes any attempt by Apple, the alleged infringer, to challenge Plaintiffs' copyright ownership. *X-IT Products, L.L.C. v. Walter Kidde Portable Equipment, Inc.*, 155 F. Supp. 2d 577, 604 (E.D. Va. 2001) ("when there is no dispute between the original copyright owner and his licensee or assignee, 'it would be anomalous to permit a third-party infringer to'" challenge the transfer), *quoting Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 37 (2d Cir. 1982); a*ccord Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428-29 (9th Cir. 1996); *Hart v. Sampley*, Civ. A. No. 91-3068 (CRR), 1992 WL 336496, *1 (D.D.C. June 24, 1992) ("Even if, as defendants suggest, the transfer was in some way defective, the defendants would not have standing to challenge the validity of the transfer because they were not parties to the agreement.").

---

[2] The Court may *sua sponte* take judicial notice of copyright registration information available on the U.S. Copyright Office's public catalog, and "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c); *BMG v. Cox*, 149 F. Supp. 3d at 646 and n.5 (E.D. Va. 2015), aff'd in part, rev'd in part, 881 F.3d 293 (4th Cir. 2018) (taking judicial notice of Copyright Office public catalog entries demonstrating registration and citing cases).

## C.     The Internal Four Jays Dispute

As set forth in the Riva Declaration, there is a family dispute between Harry Warren's granddaughters concerning the percentage of Four Jays ownership. In 1996, Peter Hacker, Jophe Jones and Julia Riva assigned all their interests in the Warren copyrights to Four Jays. Riva Decl., ¶ 8, Exhs. 7-8. These assignments were part of a transaction in which Jophe and Julia bought their brother's 1/3 interest in Four Jays. Riva Decl., ¶ 9. Since this transaction, Jophe and Julia have each been 50% owners of Four Jays. Riva Decl., ¶ 9.

For many years Jones and Riva ran the company together and shared in its profits equally. Riva Decl., ¶ 10. Disagreements developed, however, which resulted in multiple lawsuits and the appointment of an independent member of the company's board. Jones no longer participates in Four Jays business and Riva has overseen its day-to-day operations for several years. Riva Decl., ¶ 10.

There is no dispute that Four Jays owns what had been (prior to 1996) Julia Riva's and Peter Hacker's shares of the U.S. copyrights in the works at issue. Hacker Tr., 127:04-25 and Exhibit 4 to the deposition (Schwartz Decl., Exhs. 74-75). Up until 2020, there was no dispute that Four Jays also owned what had been (prior to 1996) Jophe Jones's share of the U.S. copyrights in these works. In around 2020, almost 25 years after she signed the assignment (Exhibit 7), Jones disputed the 1996 assignment in one of the lawsuits between Jones and Riva. Riva Decl., ¶ 14. While Jones does not dispute that she signed the 1996 assignment,[3] she now claims the assignment is invalid due to lack of consideration, notwithstanding that she participated as an owner-operator, of Four Jays for nearly 20 years, including being the Vice President of Four Jays for several years before 1999, and CFO of Four Jays from 1999-2017 during which time Jones had access to all of the books and records and records of the company, kept the accounts, and received 50% of all

---

[3] Jones has testified at deposition in these cases and conceded that she signed it. *Jones Tr.*, 69-70 (Exh. 9)

its profits since 1996. Riva Decl., ¶ 15; *Jones Tr.*, 30, 181-182 (Exh. 9). The California Superior Court recently denied her motion for summary judgment on this issue and ruled that "[ Four Jays ] and cross-defendant (Rivas declaration) have put forth evidence that Jones received valuable consideration for her 1996 Assignment of rights." Riva Decl., ¶ 15, Exh. 10.

We respectfully submit that there is no dispute that Four Jays owns a percentage of the Warren works as identified in the Composition Chart (Exh. 1). The California court has already denied Jones's motion for summary judgment and rejected her belated argument that there was inadequate consideration. In the unlikely event that the bench trial is not concluded or there is a different outcome by the time this case proceeds to trial, any awards for Four Jays can be adjusted to reflect Four Jays' percentage ownership.

## Point III

### The Recordings at Issue Embody Plaintiffs' Compositions

Plaintiffs have submitted the deposit copies comprised of the sheet music and lyrics for all the work at issue in this case. Levenson Decl., ¶¶ 3-6, Schwartz Decl., ¶ 9, Exh. 59. The Copyright Office could not locate the deposit copies for the 24 musical works identified in Exhibit 2 the Expert Report of Stephen Braitman. Levenson Decl., ¶¶ 3-5; Exh. 68. Braitman Decl., ¶ 2 (Braitman Report, Exh. 2. Stephen Braitman identified the first published edition of each of the 24 works. Under the 1909 Copyright Act, the first published edition of a musical work had to be deposited with the Copyright Office at the time of registration. Braitman Decl., ¶ 2 (Braitman Report, p. 4-5 (citing 1909 Copyright Act Sections 12 and 54)).

Plaintiffs' expert witness, Dr. Alexander Stewart, performed an exhaustive analysis, listening to each of 1,204 recordings identified by Plaintiffs in these actions and identifying whether the lyrics and/or melody of the recording matched the deposit copies obtained from the Copyright Office and first published editions

identified by Braitman (collectively, "deposits"). Stewart Decl., ¶ 2 (Stewart Report, p. 17-18 , Exhibit 1 thereto); ¶ 8. If either the lyrics or melody matched the deposit, then musical work registered with the Copyright Office was embodied in the recording. Stewart Decl., ¶ 8. Dr. Stewart concluded that all but 13 of the 1,204 recordings[4] at issue, a total of 1,191 recordings, embody Plaintiffs' copyrighted musical works as fixed in the sheet music deposited with the U.S. Copyright Office at the time of their registration. Stewart Decl., ¶ 2 (Stewart Report, Exh. 1), ¶ 12; Braitman Decl., ¶ 2 (Exhibit 1 Braitman Report).

Dr. Stewart's report includes a spreadsheet identifying where the recordings matched the copyrighted compositions and noting, specifically, the timing of when the title phrase for each song appeared in the recording. *See* Stewart Decl., ¶ 2 (Stewart Report p. 17-18, Exh. 1 thereto). Apple hired a rebuttal expert who could not rebut any of Dr. Stewart's conclusions as to the matching of compositions in the recordings to the compositions in the deposit copies of Plaintiffs' works. Schwartz Decl., Exhs. 77-80 (*Finell Tr.*, 177:09-178:13).

## Point IV

### Apple Violated Plaintiffs' Exclusive Rights of Reproduction, Distribution, and Importation

Copyright owners of a musical work have the exclusive right to reproduce and distribute their work under 17 U.S.C. § 106(1)(3), and the exclusive right to import the works under 17 U.S.C. § 602. Apple's reproduction, distribution and importation of unauthorized copies of Plaintiffs' copyrighted compositions, all without Plaintiffs' authorization, as set forth in the Arlen, Kolbert, Henderson and Riva Declarations, violates these exclusive rights and constitutes copyright infringement.

---

[4] 13 recordings were mistitled and do not contain the musical work in the title of the recording. Stewart Report, Exh. 1.

## A.        Reproduction

The reproduction right is infringed by making a copy of a work without a license. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) (defendant's "loading of copyrighted software into RAM creates a 'copy' of that software in violation of the Copyright Act"); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 350 (S.D.N.Y. 2000) (granting summary judgment against defendant who "copied [plaintiffs'] recordings onto its computer servers so as to be able to replay the recordings for its subscribers"); *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 648- 50 (S.D.N.Y. 2013) ("Courts have consistently held that the unauthorized duplication of digital music files over the Internet infringes a copyright owner's exclusive right to reproduce.").

In this case, it is undisputed that Apple reproduced all of the recordings at issue embodying Plaintiffs' works. Apple has produced three spreadsheets providing the metadata from its servers for all the recordings at issue. Schwartz Decl., ¶ 37, Exhs. 28-30. These spreadsheets all identify the date that Apple "ingested" the recording from the relevant provider. See Exhs. 28-30, "Ingestion Date" Column. Apple has made admissions that it made at least one server copy of the recordings at issue.[5] Each of these copies made by Apple infringes Plaintiff's exclusive right of reproduction.[6]

---

[5] *See* Schwartz Decl., Exh. 17 (Apple (Pickwick) RFA Responses, ¶¶ 60-61), and Exhibit 18 (Apple (Genepool) RFA Responses, ¶¶ 95-96). Apple agreed to revise its denial in the Adasam case, but never did. Schwartz Decl., Exh. 20.

[6] Apple does not keep track of how many copies of a recording it makes on its servers. *Williamson Tr.*, 106:2-4.

**B.      Distribution – Making Available**

Here, Apple violated Plaintiffs' distribution rights in two ways, by making the recordings embodying their works available for sale and by actually selling them. The "Making Available" right is recognized by the U.S. Copyright Office, the Ninth Circuit, and Nimmer.

In February 2016, the U.S. Copyright Office issued a report expressly recognizing that a copyright owner's exclusive distribution right includes the right to make copies of the work available to the public:

> In general, where a party offers members of the public access to a work in the form of a download, the offer implicates the right of distribution . . . . the statutory language, context, and legislative history all indicate that **Congress intended to reserve to copyright owners the right to determine whether and how their works are made available to the public in copies, including digital files**. References to the distribution right in other sections of the Copyright Act demonstrate that Congress did not intend for infringement claims to require a completed transfer of copies in all instances.

*See* U.S. Copyright Office, The Making Available Right in The United States at p. 74 (Feb. 2016) ("Copyright Office Report").[7]

The Copyright Office's conclusion is consistent with Ninth Circuit's statement of the law. "The distribution right in § 106(3) allows the copyright owner to decide 'when, under what circumstances, and for what price he will release copies of his work to the public.'" *L'Anza Research Intern., Inc. v. Quality King Distributors, Inc.*, 98 F.3d 1109 (9th Cir. 1996)(citing *Parfums Givenchy, Inc. v. C &C Beauty Sales, Inc.*, 832 F.Supp. 1378, 1390 (C.D.Cal 1993). This is because "a copyright holder possesses 'the right to exclude others from using his property.'" *Perfect 10, Inc. v. Google,* 653 F.3d 976, 980 (9th Cir. 2011)(citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006). "The copyright is the right to control the work, including the decision to make the work available to or withhold it

---

[7] https://www.copyright.gov/docs/making_available/making-available-right.pdf. (A copy of the Copyright Office Report is submitted with the Schwartz Declaration as Exhibit 76).

from the public." *Laws v. Sony Music Entm't, Inc.,* 448 F.3d 1134, 1137 (9th Cir. 2006); *Maloney v. T3Media Inc.*, 853 F.3d 1004 (9th Cir. 2017)(same); *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 678 (9th Cir. 2012)(same); see *Enterprises Intern., Inc. v. International Knife & Saw, Inc.*, 2014 WL 3700952, *19 (W.D.Wa 2014)(state law claims preempted by 17 U.S.C. § 106 which gives plaintiff "the right to make the work available to the public.)

Further, in *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001), the Ninth Circuit held Napster users infringed of 106(3) by making copies available for others to download. No actual dissemination of copies was required by the Ninth Circuit to find infringement. The Ninth Circuit found as follows:

> [P]laintiffs have shown that Napster users infringe at least two of the copyright holders' exclusive rights: the rights of reproduction, § 106(1); and distribution, § 106(3). **Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights.** Napster users who download files containing copyrighted music violate plaintiffs' reproduction rights.

*Napster,* at 1014 (emphasis added).

The *Napster* court therefore found infringement Section 106(3) based solely on the fact that users had "upload[ed] *file names* to the search index for others to copy…" *Id.* (emphasis added). The *Napster* decision cited no evidence of actual dissemination (file *names* were uploaded, not copies) and includes lengthy recitations of facts showing that the only evidence before the court was that Napster users had made file names available in the index. ("B. Listing Available Files," *Napster,* at 1011; "C. Searching For Available Files," *Napster,* at 1012).

Actual dissemination of copies was not considered or required by the Ninth Circuit in *Napster*. The Ninth Circuit's finding of a violation of 106(3) was based solely on the evidence that Napster users had made copyrighted materials available for others to copy by uploading a file name (not a copy of the work) to an index. This determination that Napster users infringed 106(3) was necessary for the

plaintiffs to seek, and the court to find, Napster liable under a theory of contributory infringement. *Napster* at 1013 n. 2.

Finally, the "making available right is recognized by Nimmer, widely acknowledged as the foremost expert on U.S. copyright law and is nearly universally cited by courts on these issues. Nimmer has been cited in the Ninth Circuit over 200 times. In the most recent version of the treatise, Nimmer explicitly recognizes the making available right:

> The distribution right accorded by Section 106(3) is to be interpreted broadly, consonant with the intention expressed by its drafters. It extends to the offer to the general public to make a work available for distribution without permission of the copyright owner. No consummated act of actual distribution need be demonstrated in order to implicate the copyright owner's distribution right.

Nimmer on Copyright § 8.11[B][4][d](2013).

Here is no dispute that all the relevant recordings were made available by Apple. Exh. 16 (Apple (*Adasam*) RFA Responses ¶¶ 42-43), Exh. 17 (Apple (*Pickwick*) RFA Responses, ¶¶ 48-49), and Exh. 18 (Apple (*Genepool*) RFA Responses ¶¶ 83-84).

## C.   Distribution - Sales

Reproducing server copies and then making, selling, and distributing digital downloads or promotional streams of digital recordings embodying copies of Plaintiffs' compositions without their permission violates Plaintiffs' exclusive distribution rights under Sections 106(1). *UMG Recordings, Inc. v. Stewart*, 461 F. Supp. 2d 837, 842 (S.D. Ill. 2006) ("making and transmitting a digital copy of the music... violate[s] copyright holders' reproduction and distribution rights."); *UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993, 997 (E.D. Cal. 2004) (by "selling unauthorized copies ... of Plaintiffs' copyrighted sound recordings ... directly infringed Plaintiffs' copyrights in the sound recordings."); *RSO Records, Inc. v. Peri*, 596 F. Supp. 849, 853 (S.D.N.Y. 1984) (the "duplication and subsequent sale of [plaintiffs'] sound recordings ... violates the copyright holders' exclusive rights of

1    both reproduction and distribution.").

2        It is undisputed that Apple has sold many of the tracks embodying Plaintiffs'

3    copyrighted compositions. In fact, Apple has produced U.S. sales records for each

4    case, comprised of a spreadsheet (Schwartz Decl., Exhs. 32-34) showing every

5    month in which it sold at least one of the relevant recordings in the U.S. and has

6    stipulated to these sales. Schwartz Decl., ¶ 42, Exh. 35. Apple's sales data show that

7    it sold at least one copy of a recording embodying 44 of Plaintiffs' compositions in

8    Adasam, 83 in Pickwick, and 35 in Genepool. Schwartz Decl., ¶ 39-41, Exhs. 32-

9    35. Apple admits that for each sale, Apple caused a reproduction of the recording to

10   be reproduced on the computer of its customer. Exh. 17 (Apple (*Pickwick*) RFA

11   Responses, ¶ 57). Each one of the sales reflected in the sales spreadsheets (Schwartz

12   Decl., Exhs. 32-34) is a violation of Plaintiffs' distribution right.

13       In addition, Apple made all of the recordings available for sale or free

14   promotional streams to the public on iTunes without any license. Schwartz Decl.,

15   Exh. 16 (Apple (*Adasam*) RFA Responses ¶¶ 42-43), Exh. 17 (Apple (*Pickwick*)

16   RFA Responses, ¶¶ 48-49), and Exh. 18 (Apple (*Genepool*) RFA Responses ¶¶ 83-

17   84); Arlen Decl., ¶ 14; Kolbert Decl., ¶ 9; Henderson Decl., ¶ 15; Riva Decl. ¶ 20.

18   Apple never tracked how many promotional streams of the Adasam, Pickwick and

19   Genepool recordings it made and does not know how many promotional streams of

20   these recordings it made. Schwartz Decl., Exh. 16 (Apple (*Adasam*) RFA

21   Responses ¶¶ 44-45), Exh. 17 (Apple (*Pickwick*) RFA Responses, ¶¶ 50-51), and

22   Exh. 18 (Apple (*Genepool*) RFA Responses ¶¶ 85-86).

23   **D.    Importation**

24       Under 17 U.S.C. § 602(a), "[i]mportation into the United States, without the

25   authority of the owner of copyright under this title, of copies or phonorecords of a

26   work that have been acquired outside the United States is an infringement of the

27   exclusive right to distribute copies or phonorecords under section 106, actionable

28

1 under section 501." "By its terms, § 602(a) sets forth three requirements for an

2 importation infringement claim: (1) plaintiff must be the "owner of the copyright"

3 in the work in question; (2) copies of the work must have been imported into the

4 United Sates "without the authority of the owner of the copyright"; and (3) the

5 imported copies must have been "acquired outside the United States." *BMG Rights*

6 *Management (US) LLC v. Global Eagle Entertainment Inc.*, 2019 WL 6315533, *7

7 (C.D.Cal 2019)(granting summary judgment on importation infringement of digital

8 copies of sound recordings).

9     Further, even if a person obtains a valid compulsory license, unauthorized

10 importation is not cured, and the unauthorized importer is liable for infringement

11 notwithstanding the existence of a compulsory license. *T.B. Harms Co. v. Jem*

12 *Records, Inc.*, 655 F.Supp. 1575, 1583 (1987). The *T.B. Harms* Court reasoned:

13         [T]o allow the defendant to rely on a limitation of the
        owner's exclusive rights [the compulsory license] to circumvent

14         the prohibition on importation would tie the hands of the
        copyright holder who seeks to exercise his rights to control

15         copies of the work which enter the American market. Thus, in
        order to construe the Copyright Act so as to fulfill Congress'

16         intent to set restrictions on the importation of phonorecords in
        order to preserve the rights of these owners, the Court finds that

17         the exclusive rights of a copyright owner to enforce section 602
        are not limited by the compulsory licensing provision of the Act.

18 *Id*.

19

20     Here, there can be no dispute that Apple has violated Plaintiffs' importation

21 rights. As noted above, Apple concedes that it received all the recordings identified

22 in the cases from the relevant distributors, all of whom are located overseas.

23 Adasam, Genepool, Ideal Music, Pickwick Group Limited, and Pickwick

24 International Limited are all located in the United Kingdom. Schwartz Decl., Exhs.

25 60-66.[8] ████████████████████████████████████████

26 ████████████████████████████████ Schwartz Decl., ¶ 49, Exhs. 52.

27    [8] The Court may take judicial notice of a foreign corporate registration because it contains

28

**Point V**

**Apple Has No Valid Licenses**

In each of the cases, Apple has asserted an affirmative defense claiming that it has valid licenses to reproduce, distribute, and import recordings embodying Plaintiffs' copyrighted works. *Adasam* ECF, 30 (Fourteenth Affirmative Defense) *Pickwick* ECF, 59 (Fourteenth Affirmative Defense); *Genepool* ECF, 51 (Fourteenth Affirmative Defense). Apple claims licenses for many of the recordings at issue based on Section 115 notices served by its agent Music Reports, Inc. ("MRI"). In the Adasam case, Apple claims a license based on requests made by Adasam to the Harry Fox Agency after the lawsuit was filed. Apple cannot meet its burden on summary judgment for establishing the validity of any of these licenses.

**A.     Apple Has the Burden of Proving its Licensing Affirmative Defense**

A person invoking the compulsory license provision bears the burden of proving that any recording embodying the musical work licensed under Section 115 was duplicated with authorization. *ABKCO Music Inc. v. Sagan*, 2018 WL 1746564, *15 (S.D.N.Y. 2018). This is because a Section 115 compulsory license is an affirmative defense to copyright infringement. *Kihn v. Bill Graham Archives, LLC*, 445 F.Supp.3d 234, 250 (N.D.Cal. 2020)(citing *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1076 (9th Cir. 2015); *Davidson v. United States*, 138 Fed.Ct. 159 (Fed Claims 2018)("Defendant bears the burden of proof on [a] statutory defense [to copyright infringement]"); *See generally* Fed. R. Civ. P.

---

information that can be accurately and readily determined from a source, the UK Companies House, whose accuracy cannot reasonably be questioned. See Fed. R. Evid. 201(b); *Neman Fin., L.P. v Citigroup Glob. Markets, Inc.,* LACV 14-2499-VAP, 2018 WL 6265061, at *2 [CD Cal Sept. 5, 2018](taking judicial notice of a registration from "the official British government website of Companies House, an Executive Agency of the Department for Business, Innovation and Skills of the Government of the United Kingdom, which maintains official records of incorporation and dissolution of companies.").

8(c)(1) item 12 (license is an affirmative defense).

**B.    MRI's Section 115 Notices Are Invalid**

Under 17 U.S.C. § 115, there is an exception to the copyright owner's exclusive rights to reproduce and distribute a musical work. Section 115 provides that "[a] person may by complying with the provisions of this section obtain a compulsory license to make and distribute phonorecords of a nondramatic musical work." Section 115 provides three requirements to obtain a compulsory license (1) timely notice; (2) sufficiency of notice; and (3) eligibility to obtain a compulsory license. Apple cannot meet any of these required elements.

*1.    Timely Notice*

Section 115 requires that in order to obtain a compulsory license, a "Notice of Intention To Obtain A Compulsory License" must be served on the copyright owner of the musical work within 30 days of reproduction and prior to any distribution. 17 U.S.C. 115(b)(1). If a person fails serve the notice in a timely manner, the person is "foreclosed" from obtaining a compulsory license of the musical work. 17 U.S.C. 115(b)(2).

Section 115 was amended, effective October 11, 2018, by what is commonly termed the Music Modernization Act (the "MMA"). Prior to its amendment, Section 115 provided in pertinent part that: "Any person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making and before distributing any phonorecords of the work, serve notice of intention to do so on the copyright owner." The pre-amendment statute applies in this case because Apple first ingested (made phonorecords) all of the musical works prior to the amendment. All citations to Section 115 herein are to the pre-MMA statute.

This timely notice requirement "is strictly enforced." *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 429 F.3d 39, 42-43 (2d Cir. 2005). "Failure to serve or file the notice required by [§ 115(b)(1)] forecloses the possibility of a compulsory

license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement.'" *Id.* (quoting 17 U.S.C. § 115(b)(2)). "[F]ailure to serve the notice of intention before distributing phonorecords . . . precludes the creation of a compulsory license, and it does so both as to copies distributed prior to service and as to copies distributed thereafter." *Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 312 (S.D.N.Y. 1999); *Blagman v. Apple, Inc.*, 2014 U.S. Dist. LEXIS 45401, at *16 ("If the party reproducing the song does not abide by the procedures of § 115, however, no compulsory license may be granted and the party may be liable for infringement if he has not secured a negotiated license.").

Timely service of the NOI is the "keystone" of compulsory licensing scheme under the Copyright law and that "violations should be dealt with strictly." *Norbay Music, Inc. v. King Records, Inc.*, 249 F.Supp. 285, 289 (S.D.N.Y. 1966)(citing *Shapiro, Bernstein & Co. v. Remington Records, Inc.*, 265 F.2d 263 (1959)). *Shapiro, Bernstein & Co. v. Remington Records, Inc.*, 265 F.2d 263 (2d Cir. 1959)("failure of notice" found where record company sent the NOI after shipment of infringing records and made no report or accounting of royalties).

Here, Apple cannot meet the timeliness requirements for virtually all of recordings at issue. As set forth in the Schwartz Declaration, the "licenses" relied on by Apple either don't exist or were served late.

The Infringement Chart submitted with this motion (Exh. 3) highlights in orange all the recordings for which Apple never served a notice for the corresponding composition. Schwartz Decl., ¶ 2, Ex. 3. The Infringement Chart highlights in yellow all the recordings for which the corresponding notice served by Apple was late, having been served more than 30 days after Apple ingested and reproduced the recording embodying one of Plaintiffs' works. Schwartz Decl., ¶ 5, Ex. 3. For these tracks, because Apple failed to serve timely NOIs, their purported

compulsory licenses are invalid, and their exploitations of Plaintiffs' Works constitute acts of infringement. See *Blagman*, 2014 U.S. Dist. LEXIS 45401, at *16 (S.D.N.Y. 2014).

Finally, Apple served the NOIs months *or years* after it had already made copies of Plaintiffs' musical works.[9]  Schwartz Decl., ¶ 5, Ex. 3. The Infringement Chart highlights in purple all the recordings for which the notice served by Apple for the corresponding recording was late, having been served more than 30 days after Apple ingested and reproduced another recording embodying one of Plaintiffs'' works.. Schwartz Decl., ¶ 6, Ex. 3. Once Apple failed to timely serve an NOI for a musical work, Apple is permanently foreclosed from ever serving an NOI for that musical work. *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 429 F.3d 39, 42-43 (2d Cir. 2005) (quoting 17 U.S.C. § 115(b)(2)).

## 2.     *Sufficiency of the Notice*

Section 115(b)(1) provides that the notice of intention to obtain a compulsory license "shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation." 37 C.F.R. § 201.18. provides the information required to be included in a valid NOI such as the name of the artist, the catalog number, the label name, the expected date of initial distribution. 37 C.F.R. § 201.18(d)(v)(E-H). See *Harris v. Emus Records Corp*. 734 F.2d 1329, 1334 (9th Cir. 1984)("[t]he notice of provision for compulsory licenses insures that the copyright owner can monitor use in order to determine that accountings are accurate.") There is no question that Section 115 requires "timely and sufficient notice to the owner of the copyright in the musical work." *Palladium Music, Inc. v. Eatsleepmusic, Inc.*, 398 F.3d 1193, 1199 (10th Cir. 2005).

---

[9] Apple was unable to confirm whether any NOIs were sent to Plaintiffs. *Williamson Tr.,* 185:08-12.

1       Here, the notices served on Apple's behalf fail to meet the basic statutory

2   requirements. The following excerpt is typical of all the NOIs served on Apple's

3   behalf:

| Title of musical work: | See Schedule A |
|---|---|
| Author(s): | See Schedule A |
| Copyright Owner(s): | See Schedule A |
| Phonorecord configuration(s): | Digital Phonorecord Deliveries, as set forth in 17 U.S.C. § 115 including, but not limited to, interactive streams and limited downloads. |
| Expected date of initial distribution: | July 5, 2013 |
| Artist(s): | Various |
| Catalog number(s): | Various |
| Label name(s): | Various |
| Signature by Licensee: | Music Reports, Inc. o/b/o Licensee<br><br>By: _W.B. Cotton_<br><br>Music Reports, Inc. is authorized to execute this Notice of Intention on behalf of Licensee.<br>Dated: June 25, 2013 |

Schwartz Decl., ¶ 51, Exh. 56.

11      Notably, Apple's NOIs only include the title of the work. ████████████

12  ████████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████████

15  ███████████████████████████████████████ *Williamson Tr.*, 179:04 –

16  180:17. All this information must be included in the notice, plus the expected date

17  of initial distribution for the notice to be valid. *Harris v. Emus Records Corp.* 734

18  F.2d 1329, 1334 (9th Cir. 1984)("[t]he notice of provision for compulsory licenses

19  insures that the copyright owner can monitor use in order to determine that

20  accountings are accurate."). 37 C.F.R. § 201.18(d)(v)(E-H).

21  ████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████ *Williamson*

23  *Tr.*, 125:08-125:16; Kolbert Decl., ¶ 12; Henderson Decl., ¶ 18, Riva Decl., ¶ 23.

24  Schwartz Decl., Exh. 16 (Apple (*Adasam*) RFA Responses ¶¶ 49-50), Exh. 17

25  (Apple (*Pickwick*) RFA Responses, ¶ 55), and Exh. 18 (Apple (*Genepool*) RFA

26  Responses ¶¶ 30). ██████████████████████████████████████████████████████

27

28

1    ███████████████████████████████████████████████████████████

2    ████████████████████████████ *Id.*

3        Further, Apple never tracked how many promotional streams of the Adasam,

4 Pickwick and Genepool Recordings it made and does not know how many

5 promotional streams of these recordings it made. Schwartz Decl., Exh. 16 (Apple

6 (*Adasam*) RFA Responses ¶¶ 44-45), Exh. 17 (Apple (*Pickwick*) RFA Responses,

7 ¶¶ 50-51), and Exh. 18 (Apple (*Genepool*) RFA Responses ¶¶ 85-86). In *Shapiro,*

8 *Bernstein & Co. v Remington Records, Inc.*, 265 F.2d 263 (2d Cir. 1959) the

9 defendant record company, like Apple, did not keep records of the number of copies

10 of records manufactured pursuant to a purported compulsory license. The Court

11 held such failure supported an inference of wrongdoing:

12               When the defendants availed themselves of the benefit of
        the compulsory licensing scheme of the Copyright Act by

13         manufacturing records without following the statutory
        obligations of notice and reports . . . and frustrate the proof of

14         the amount of liability . . . by failing to keep accurate records . . .
        all doubts and uncertainties as to the volume of the unknown

15         production should be resolved strictly against the defendants. . . .
        The Court may presume the strongest case again him who, by

16         his conscious, deliberate act has seemingly made accurate, direct
        proof of the true facts impossible. We will not permit

17         commercial piracy to produce illegal gains immune from
        recovery.

18 *Id*. at 271-274.

19        Finally, on this point, Apple's notices were fraudulent because the expected

20 dates of distribution indicated on them is false. Each NOI must identify "[t]he

21 expected date of initial distribution of phonorecords already made (if any) or

22 expected to be made under the compulsory license." 37 CFR § 201.18(d)(v)(E).

23 ███████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████████

25 ███████████████████████████████████████████████████

26        ███████████████████████████████████████████████

27       ████████████████████████████████████████

28

*Williamson Tr.*, 152:24- 153:25.

The dates provided in Apple's NOIs were plainly fraudulent. Many of Plaintiff's Musical Works had already been reproduced by Apple more than 30 days before Apple served any NOI. Schwartz Decl.Exh. 3. Further, many of Plaintiffs' works ***had already been sold*** by Apple on iTunes before the date of expected distribution provided by Apple in its NOI. Schwartz Decl., Exh. 3.

### 3.   *Eligibility*

Finally, Apple cannot meet its burden on proving its affirmative defense

because all of the recordings at issue are pirated. Under Section 115(a)(1), "[a] person may not obtain a compulsory license for use of the [musical] work in the making of phonorecords duplicating a sound recording fixed by another, unless: (i) such sound recording was fixed lawfully; and (ii) the making of the phonorecords was authorized by the owner of copyright in the sound recording or, if the sound recording was fixed before February 15, 1972, by any person who fixed the sound recording pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording." 17 U.S.C. § 115(a).

In other words, Section 115 compulsory licenses are not applicable to pirated versions of existing recordings. *Harris v. Emus Records Corp.* 734 F.2d 1329 at n.2 (9th Cir. 1984); *See Blagman v. Apple, Inc.*, 2014 WL 1285496, *7 (S.D.N.Y. 2014) ("although the claims in the Amended Complaint are tied solely to infringement of compositions, whether the Suppliers duplicated recordings without authorization from the copyright holder of the sound recording is critical to determining whether a compulsory license in the underlying composition is even available") (citing Section 115(a)(1); *see* 2 Nimmer § 8.04[E][2] ("if the affected sound recording is not subject to statutory copyright because it was fixed before February 15, 1972, then the compulsory licensee must be authorized to make that duplication by the person who fixed the sound recording, who must, in turn, have made the fixation pursuant to a consensual or compulsory license from the copyright owner of the musical work that was thus fixed.").

All the pirated recordings at issue were originally released by major and independent record labels in the 1920s-1960s such as Atlantic Records, Blue Note, Capitol, Columbia, Decca, Mercury, MGM, RCA Victor, and Verve. Saperstein Decl., ¶ 2 (Saperstein Report, p. 7-8 and Exhibit 1 thereto). There is no record of Adasam, Pickwick, Genepool or Ideal Music originally releasing these recordings.

1    *Id.*[10]

2         The major labels, Sony, Warner, Universal, BMG and Concord, have all

3    provided sworn declarations affirmatively stating that they are the owners of the

4    Atlantic Records, Blue Note, Capitol, Columbia, Decca, Mercury, MGM, RCA

5    Victor, and Verve catalogs (among others) and they have identified their ownership

6    of many of the specific recordings at issue in this case and that they never

7    authorized Adasam, Pickwick, or Genepool to reproduce, distribute or sell any of

8    their recordings on iTunes or granted them permission to authorize Apple to do so..

9    Schwartz Decl., Exh. 26 (Goldman Decl., ¶¶ 2-11); Schwartz Decl., Exh. 25 (Parry

10   Decl., ¶¶ 2-10); Schwartz Decl., Exh. 24 (Jacoby Decl., ¶¶ 2-7); Schwartz Decl.,

11   Exh. 27 (Hauprich Decl., ¶¶ 2-7); Schwartz Decl., Exh. 23 (J. Cho Decl., ¶¶ 3-16).

12   More important, for purposes of this motion, these major labels never authorized

13   Apple to make permanent downloads of these recordings that were provided to

14   Apple by Adasam, Pickwick, or Genepool. Schwartz Decl., Exh. 26 (Goldman

15   Decl., ¶ 12); Schwartz Decl., Exh 25 (Parry Decl., ¶ 11); Schwartz Decl., Exh 24

16   (Jacoby Decl., 8); Schwartz Decl., Exh 27 (Hauprich Decl., ¶ 8); Schwartz Decl.,

17   Exh 23 (J. Cho Decl., ¶ 17). ███████████████████████████████████

18   ████████████████████████████████ *Williamson Tr.*, 35:20-24. The

19   relevant experts in the case, including Apple's expert Steven Marks, also agree that

20   major labels are reliable sources of ownership information. *Marks Tr.*, 30:12-20;

21   122:13-18; *Roberts Tr.*, 245:8-9.

22         Plaintiffs' expert musicologist, Dr. Stewart, identified a sample of 605 (out of

23   1,191) Adasam, Pickwick and Genepool recordings that are identical to the

24   recordings sold by major labels. Stewart Decl. ¶ 2 (Dr. Stewart Report Exh. 2).

25   Apple's expert, Judith Finell, disagreed with Dr. Stewart's conclusions on only 26

26   ────────────────

27   [10] ██████████████████████████████████████  *Williamson Tr.*, 70:22-71:23.

28

of these 605 recordings (agreeing that 579 recordings were the same). *Finell Tr.*, Exh. 21. Plaintiffs' counsel provided Dr. Stewart with 605 sample recordings[11], but were unable to obtain copies of all of the "source material" (major label recordings) pirated by Adasam, Pickwick and Genepool for review by Dr. Stewart. Finally, it must be noted that in the 26 instances in which Judith Finell disputed a match with a major label recording, this only means Plaintiffs' counsel did not provide the correct "source" recording for the pirated copy sold by Adasam, Pickwick and Genepool – not that Adasam, Pickwick or Genepool actually hired Benny Goodman or Ella Fitzgerald to record "It's Only A Paper Moon" and produced these recordings on their own. *Finell Tr.*, Exh. 21 (Track # A-AR-035 is Benny Goodman "It's Only A Paper Moon"; Track # G-AR-007 is Ella Fitzgerald "It's Only A Paper Moon); *see* Stewart Report Exhibit 2 for Track # identification.

Further, Audible Magic, a reliable technology used to identify recordings, has confirmed that Adasam, Pickwick and Genepool are copying major label recordings. Roberts Decl., Exh. 2 (Roberts Report, Exhs. 3-4). Audible Magic is industry standard technology that has been accepted by numerous courts as reliable for identifying matching recordings[12] and Apple's expert (Steven Marks) and Plaintiff's expert (Ty Roberts) agree that Audible Magic is reliable. *Marks Tr.*, 125:18-20; Roberts Report p. 5.

---

[11] Dr. Stewart did not analyze six major label recordings provided by Plaintiffs' counsel to confirm whether they were the same as Adasam, Pickwick and Genepool recordings. Stewart Decl., ¶ 2 (Stewart Report Exhibit 2).

[12] *Capitol Records, LLC v. Escape Media Grp., Inc.*, 2015 WL 1402049, at *23 (S.D.N.Y. 2015); *UMG Recording, Inc. v. Escape Media Grp., Inc.*, 2014 WL 5089743, *17 (S.D.N.Y. 2014); UMG Recordings, Inc. v. Shelter Capital Partners LLC, 718 F.3d 1006, 1012 (9th Cir.2013); *Arista Records LLC v. Lime Wire LLC*, 2010 WL 10031251, at *6 (S.D.N.Y. Aug. 9, 2010); *Arista Records LLC v. Myxer Inc.,* 2011 WL 11660773, at *5 (C.D.Cal. Apr. 1, 2011); Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd., 518 F.Supp.2d 1197, 1205–06 (C.D.Cal.2007); UMG Recordings, Inc. v. Veoh Networks *Inc.*, 665 F.Supp.2d 1099 (C.D.Cal.2009); *UMG Recordings, Inc. v. Grande Communications Networks, LLC*, 384 F.Supp.3d 743 (W.D.Tex 2019).

Audible Magic confirmed that at least 638 recordings from Adasam, Pickwick and Genepool match the recordings sold by major labels. Roberts Decl., ¶ 2 (Roberts Report, p. 10, Exh. 4). It is obvious that Adasam, Pickwick and Genepool were simply pirating original copies of famous recordings and providing these pirated copies to Apple for sale on iTunes. There is simply no evidence at all that Adasam, Pickwick and Genepool had any rights to any of the recordings it provided to Apple for sale on iTunes and therefore, none of the NOIs attempted by Apple are valid.

Lastly, the major and other legitimate record labels sent Apple infringement notices covering 8,439 recordings provided by Adasam, Pickwick and Genepool. Schwartz Decl., ¶ 12-15, Exh. 13-14. In every one of these instances, Adasam, Pickwick and Genepool did not dispute the claims of piracy and the offending recording identified in the takedown was removed from iTunes.. Exh. 16 (Apple (*Adasam*) RFA Responses ¶¶ 76-77 and Exh. 18 (Apple (*Genepool*) RFA Responses ¶¶ 42-43).

**C.     The Harry Fox Licenses Claimed by Adasam Are Also Invalid**

Apple also claims that Plaintiffs' musical works embodied on Adasam Recordings were properly licensed from the Harry Fox Agency – Plaintiff's mechanical licensing agent.[13] As an initial matter, an HFA license is merely a Section 115 compulsory mechanical license with slight variations with respect to the method and frequency of royalty payments. *See Harry Fox Agency, Inc. v. Mills Music, Inc.*, 720 F.2d 733, 737 (2d Cir. 1983) ("even where the parties have agreed to vary the exact terms of the compulsory license section [115] but did not intend to waive its protection, the licenses were protected under that section"); *EMI Entm't World, Inc. v. Karen Records, Inc.*, 603 F. Supp. 2d 759, 763-64 (S.D.N.Y. 2009)

---

[13] Licenses to duplicate musical works embodied on sound recording are generally termed "mechanical licenses." *Harris v. Emus Records Corp.*, 734 F.2d 1329, n. 1 (9th Cir. 1984).

("Licenses issued by Harry Fox do not, however, alter the basic rights and obligations of the licensee under § 115").

Thus, like the compulsory licenses under Section 115 discussed above, Adasam's purported HFA licenses are invalid because Apple cannot show their duplication of existing recordings was authorized. See *Sony/ATV Publ'g, LLC v. Marcos*, 651 F. App'x 482, 485 (6th Cir. 2016) ("[T]he HFA license is a standard compulsory license'")(quoting 17 U.S.C. § 101). Moreover, although it is Apple's burden to show otherwise, Plaintiffs have conclusively established that all of Adasam's recordings were pirated based on the declarations of the major labels, the musicological analysis by Dr. Stewart and Judith Finell, the audio fingerprinting analysis by Audible Magic.

Finally, even if the HFA licenses were otherwise valid, these licenses were only issued in 2019 and 2020 – after a lawsuit was filed and years after Apple already made and sold copies – and after Plaintiffs had already commenced lawsuits against Apple and Adasam. *See Davis v. Blige*, 505 F.3d 90, 103 (2d Cir. 2007)(licenses are only prospective).

## Conclusion on Liability

Apple infringed Plaintiffs' copyrights in 101 musical works by unauthorized reproduction, distribution and importation. Plaintiffs did not license any of the uses made by Apple or its providers. Apple's failure to comply with the compulsory license requirements in Section 115 is absolute and total. The evidence that willfully infringed Plaintiffs' musical works, including some of the most iconic songs ever composed, is provided in the next section.

## Point VI

## Apple's Conduct Was Willful

Apple knowingly engaged in the sale of pirated copies of monumental recordings of Plaintiffs' works. Apple's willfulness is established by each of the

following decisions that Apple made:

(A)   Apple recklessly chose to do business with Adasam, Pickwick and Genepool - completely unknown "record labels" operating out of Europe – without any due diligence into their rights to famous recordings;

(B)   Apple received and ignored actual notice from major record companies that these providers were engaged in a massive piracy operation with Apple;

(C)   Apple received and ignored actual notice from the *Blagman* lawsuit, music industry lawyers, and independent record companies that these providers were engaged in a massive piracy operation;

(D)   Apple ignored its own internal investigation that concluded Adasam, Pickwick and Genepool were not the "allowed" label for 60,000 pirated recordings by popular artists;

(E)   Apple had no policy to terminate repeat infringers and continued doing business with Adasam, Pickwick and Genepool until these actions were brought by Plaintiffs;

(F)   Apple had the technology to detect "equivalent" recordings and ownership information on the upload, but allowed their providers to "overwrite" their own information in the label field. When Apple knew the "equivalent" recordings from foreign labels were being uploaded to iTunes, it did not notify the major labels that were also selling these recordings on iTunes or the musical composition copyrights owners whose rights were infringed.

## A.   Applicable Law

Courts may resolve the issue of willfulness on summary judgment if "there are sufficient undisputed material facts on the record to make the question appropriate for summary judgment." *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995); see, e.g., *U2 Home Entm't, Inc. v. Wei Ping Yuan*, 245 F. App'x 28, 29 (2d Cir. 2007) (affirming grant of summary judgment on willfulness). In this case, the record amply supports a finding of Apple's willfulness.

Section 504(c) of the Copyright Act provides that, where the defendants' infringement is willful, statutory damages may be awarded in an amount of up to $150,000 per infringement. 17 U.S.C. § 504(c). The three mental states that properly support a finding of willfulness are (1) actual knowledge, (2) willful

blindness, or (3) recklessness. "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. *Erickson Productions, Inc. v. Kast*, 921 F.3d 822, 833 (9th Cir. 2019). By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing. *Id*.

Reckless disregard can be demonstrated, for example, when a party "refus[es], as a matter of policy, to even investigate or attempt to determine [ownership of] particular [musical works.]" *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 992 (9th Cir. 2017).[14] "[T]he state of mind required to show willfulness may be inferred from the defendant's conduct." *Erickson Productions, Inc. v. Kast*, 2021 WL 3856698, *3 (N.D.Cal 2021). Circumstantial evidence can be used to prove willfulness. *Friedman v. Live Nation Merchandise, Inc.*, 833 F.3d 1180, 1189 (9th Cir. 2016).

Evidence to support finding of willful infringement includes evidence of the exactitude with which the infringing works copied the originals. *Lanard Toys Ltd. V. Novelty, Inc.*, 2010 WL 1452527, *711 (9th Cir. 2010). The existence of prior litigation involving a claim of copyright infringement can be considered. *Lanard Toys Limited v. Novelty, Inc.*, 2008 WL 11333941, *7 (C.D.Cal. 2008). The length of time of the unauthorized conduct is also relevant to willfulness. *Microsoft Corporation v. Buy Cheap Software, Inc.*, 2016 WL 7444627 (C.D.Cal 2016).

A copyright defendant may be liable for willful infringement if it fails to make any "attempt to check or inquire into" the copyright status of a work when it "has a general awareness" that it might be unauthorized, *Unicolors, Inc.*, 853 F.3d

---

[14] *See also*, *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1021 (7th Cir. 1991)(a finding of willfulness should be made where the defendant is "reckless in not knowing [its conduct is an infringement]"); *Fitzgerald Publishing Co. v. Baylor Publishing Co.*, 807 F.2d 1110, 1115 (2d Cir. 1986)(an infringement is willful if the infringer has acted in reckless disregard of the copyright owner's right). "[O]ne who undertakes a course of infringing conduct may neither sneer in the face of the copyright owner nor hide its head in the sand like an ostrich." *Video Views*, at 1021.

at 991-992, or if the defendant deliberately sells infringing products after receiving a cease-and-desist notice. *Wash. Shoe Co.*, 704 F.3d at 674. Attempting to conceal blatant copying is evidence of willfulness. *Lanard Toys Ltd. V. Novelty, Inc.*, 2010 WL 1452527, *711 (9th Cir. 2010). Evidence that the defendant ignored notices and "passed the matter off as a nuisance" may also be considered in determining willfulness. *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 512 (7th Cir. 1994).

"To refute evidence of willful infringement, [defendant] must not only establish its good faith belief in the innocence of its conduct, it must also show that it was reasonable in holding such a belief." *Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332 (9th Cir. 1990).

**B.      Apple Recklessly Chose Music Pirates as Business Partners**

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

*Williamson Tr.*, 36:23-37:24. █████████████████████████████████

███████████████████████████████ *Williamson Tr.*, 51.

███████████████████████████████████████████████████████████

███████ *Williamson Tr.*, p. 43-44. ███████████████████████████

███████████████████████████████████████████████████████████

████████████████████████ *Williamson Tr.*, 42:15-43:22.

███████████████████████████████████████████████████████████

█████ *Williamson Tr.*, 44:9-16. ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

[15] To get an Apple ID, "All you need is your full name, date of birth, an email address, and phone number." https://support.apple.com/en-us/HT204166

1 ██████████████████████████████████████████████████████

2 *Williamson Tr.*, 66:22-68:23, 70-71. ████████████████████████

3 ████████████████████████ *Williamson Tr.*, 50:19-21. Apple's procedures for

4 vetting the legitimacy of the content it released in the iTunes Store defied "common

5 sense." *Kohn Tr.*, 223:10-22.

6      Not surprisingly, there is also no record of Adasam, Pickwick or Genepool

7 originally releasing any of the recordings at issue in this case. Saperstein Decl., ¶ 2

8 (Saperstein Report, p. 7-8 and Exhibit 1 thereto). ████████████████████

9 ██████████████████████████████████████████████████████

10 ████████ *Williamson Tr.*, 70-71. ████████████████████████

11 ██████████████████████████████████████████████████████

12 ██████████████ *Williamson Tr.*, 140:1-13. Apple has long conceded that it

13 took no steps to verify its providers' rights: "They have contracts with their

14 distributors. And they have clauses in those contracts relying on the distributors to

15 verify that all the rights are in place. In terms of whether Apple takes separate steps,

16 I think is what you are asking, to verify that the distributors have done that, there

17 isn't a formal policy to do that." See *Pickwick* ECF 56, p. 7 (Schwartz Decl., Exh.

18 67). These providers were obvious pirates from the start.

19      **1.    *Adasam Was Obviously a Pirate***

20      In discovery, Apple could not provide any information given by Adasam as

21 part of its application to become a distributor for iTunes. Schwartz Decl., ¶ 54.

22 ██████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████████

24 Schwartz Decl., Exh. 52 (Tab 1).[16] As noted above, Adasam operated out of a

25      ───────────────────

26 [16] The Court may take judicial notice of the Google Maps Street View photographs of the
Adasam facility. The Ninth Circuit has taken judicial notice of Google's maps and satellite images

27 as a source whose accuracy cannot be reasonably be questioned. *United States v. Perea-Rey*, 680
F.3d 1179, 1182 n.1 (9th Cir. 2012) (internal quotations omitted). At least one court in this

28

1  facility used primarily for the sale of commercial cleaning products and services.
2  Schwartz Decl., ¶ 61, Exh. 66.

3      If Adasam's facilities were not a giveaway, the nature of its catalog should
4  have alerted Apple that it was participating in, with Adasam, a massive music
5  piracy operation. As discussed further below, Adasam's albums are nothing more
6  than compilations of every hit song released from the 1920s through the 1960s.
7  Adasam is a massive bootleg record label operating under several imprint names
8  (Blue Orchid, Six Week Smile) operating out of the offices of a janitorial supply
9  company.[17]

10 ██████████████████████████████████████████████████████████
11 █████████████████████████████████████████████ *Williamson Tr.,*
12 66:22-68:23; Schwartz Decl., ¶ 43, Exh. 16 Apple (*Adasam*) Interrogatory
13 Response # 12).█████████████████████████████████████████████████
14 ████ *Williamson Tr.,* 71:18-71:25.██████████████████████████████
15 ████████████████████████████████. *Williamson Tr.,* 67:01-
16 03. None of the experts in this case, including Apple's expert, Steven Marks, the
17 General Counsel of the RIAA from 2003-2019, have ever even heard of Adasam.
18 *Marks Tr.,* 29:02-11.████████████████████████████████████████.
19 *Williamson Tr.,* 67:02-24

20      **2.    *Pickwick Was Obviously a Pirate***
21 ████████████████████████████████████████████████
22 *Williamson Tr.,* 69:2-6; 70:2-14.██████████████████████████
23 ████████████████████████████████████████ *Williamson Tr.,* 69:2-
24 14.██

25 ─────────────
   District also has taken judicial notice of a Google Maps street view photograph similar to that
26 which defendants propose judicially noticing here. *Call v. Badgley*, 254 F. Supp. 3d 1051, 1061
   n.5 (N.D. Cal. 2017).
27      [17] See Exhibit 61 (Adasam Companies House registration).
28

1  *Williamson Tr.,* 71:18-71:25. █████████████████████████████████████

2  *Williamson Tr.,* 81:4-12.  None of the experts in this case, including Apple's expert,

3  Steven Marks, the General Counsel of the RIAA from 2003-2019, have ever heard

4  of Pickwick. *Marks Tr.,* 29:12-21.

5      **3.    *Genepool/Ideal Was Obviously a Pirate***

6  ████████████████████████████████████████████████████████████████████

7  █████████████████████████████ *Williamson Tr.,* 69:2-14. ████████████

8  ████████████████████████████████████████████████ *Williamson Tr.,*

9  71:18-71:25. None of the experts in this case, including Apple's expert, Steven

10 Marks, the General Counsel of the RIAA from 2003-2019, have ever heard of

11 Genepool or Ideal Music. *Marks Tr.,* 29:22-30:01.

12 **C.    Apple Received Notices Identifying Thousands of Pirated Recordings**

13      As early as 2010 and 2011, Apple knew that Adasam, Pickwick and

14 Genepool were engaged in a massive piracy operation. Schwartz Decl. ¶ 15, Exh.

15 14. Major record labels sent Apple infringement notices identifying thousands of

16 pirated recordings from these providers as summarized in the chart below:

| #  | Year   | Adasam | Pickwick | Genepool |
|----|--------|--------|----------|----------|
| 1  | 2010   | 252    | 174      |          |
| 2  | 2011   | 426    | 2576     | 110      |
| 3  | 2012   | 171    | 198      | 42       |
| 4  | 2013   | 13     | 131      |          |
| 5  | 2014   | 661    | 627      | 105      |
| 6  | 2015   | 74     | 312      | 125      |
| 7  | 2016   | 152    | 12       | 93       |
| 8  | 2017   | 418    | 45       | 368      |
| 9  | 2018   | 355    | 105      | 135      |
| 10 | 2019   | 367    | 70       | 45       |
| 11 | 2020   | 265    | 12       |          |
|    | Total: | 3154   | 4262     | 1023     |

24 Schwartz Decl., Exh. 14.

25      By 2011, Apple had actual notice that it was engaged in music piracy because

26 the major labels had notified Apple that its partners Adasam, Pickwick and

27 Genepool were music pirates (rendering any NOI invalid) and has demanded that

28

over 3,000 pirated recordings from these providers be removed from iTunes. For example, Apple produced documents in the Pickwick case relating to Takedown iTS13168 which it received in 2011. Schwartz Decl., Exhs. 36-37. This takedown alone includes over 400 tracks delivered by all three relevant providers (Pickwick – 315 tracks, Adasam – 98 tracks, Genepool – 51 tracks) and identified as pirated by RIAA, including the cast album for West Side Story and hundreds of recordings by artists such as Harry Belafonte, Johnny Mathis, and Miles Davis. Schwartz Decl., Exhs. 36-37. Apple continued to allow these providers to sell content on iTunes for years after this notice, and continued to enter new contracts with them even after this notice.

Apple received more notices in 2012 and 2013 covering hundreds more pirated recordings by these providers, and in 2014 Apple received an avalanche of infringement notices identifying nearly 1,400 additional pirated recordings for sale on iTunes from Adasam, Pickwick and Genepool. Schwartz Decl., Exhs. 13-14.

The notices of infringement received by Apple identify a clear pattern of Adasam-Pickwick-Genepool piracy concerning iconic recordings from the early to mid-Twentieth Century ("pre-1972 recordings"). For example, Apple received infringement notices identifying at least 10 pirated pre-1972 recordings provided by Adasam, Pickwick, and Genepool for 160 leading recording artists, including Benny Goodman (303), Ella Fitzgerald (27), Harry Belafonte (271), Louis Armstrong (10), Sarah Vaughan (35), Charlie Parker (206), Peggy Lee (78), Hank Williams (108), Joan Baez (48), Buddy Holly (51), Patsy Cline (18), Frank Sinatra (78), Edith Piaf (24), Dean Martin (33), Nina Simone (15), Dave Brubeck (62), Nat "King" Cole (98), Johnny Cash (24), and Connie Francis (70). Schwartz Decl., Exh. 38.

1 █████████████████████████████████████████

2 ████████ Exhibit 22 ("*Cook Tr.*")

3       Adasam, Pickwick and Genepool never asserted that they had rights to <u>any</u>

4 of the recordings. Schwartz Decl., ¶ 15.

5       Despite the clear notice that Apple was in business with music pirates, Apple

6 made a concerted effort to *not ask* Adasam, Pickwick or Genepool the facts and

7 circumstances by which pirated albums were provided and sold on iTunes. ██████

8 ████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ██████████████████████████████████████

11 ████████. *Cook Tr.*, 126:04-128:13. Further, when these providers acknowledged

12 they had no rights to the recordings, ***Apple never notified the composition***

13 ***copyright owners the NOIs it served were invalid and that it had infringed their***

14 ***copyrights.***

15 ████████████████████████████████████████████

16 ████████████████████████████████████████

17 ██████████████████████████████████████████ *Cook Tr.,*

18 90:6- 92:9; Schwartz Decl., Exh. 39 ████████████████████

19 ████████████████████████████████████

20 ████████████████████████ *Id.*

21 ████████████████████████████████████████████

22 ████████████████████████████████████████████

23 ████████████████████████████████████████

24 ██████████████████████████████████████████ *Cook Tr.,*

25 136:20-137:5. ████████████████████████████████████

26 ████████████████████████████████████████

27 ████████████████████████. *Cook Tr.,* 138:7-11; Schwartz Decl., ¶ 24, Exh. 40.

28

1   ██████████████████████████████████████████████████████████

2   ████████████████████████████████████████████████████████

3   ████████████████████████████████ *Cook Tr.*, 154-155; Schwartz Decl., ¶ 25,

4   Exh. 41.

5       Pickwick, for its part, simply stopped responding to notifications that it was

6   pirating recordings. Schwartz Decl., ¶ 15. Apple made no inquiry and Pickwick

7   provided no explanation. A clearer case of willfully blinding oneself to infringing

8   activity is hard to imagine.

9   **D.     The Blagman Lawsuit and Notice**

10      In 2012, Apple's problem with selling pirated copies pre-1972 recordings

11  was no longer deniable when Apple was named as a defendant in the copyright

12  infringement action, *Blagman v. Apple, Inc. et. al*. (S.D.N.Y. Dkt. No. 12-cv-5453).

13  Schwartz Decl., ¶ 16, Exh. 16 (Apple (*Adasam*) RFA Responses ¶ 55), Exh. 17

14  (Apple (*Pickwick*) RFA Responses, ¶ 60). On April 22, 2015, Blagman filed a Third

15  Amended Complaint. Schwartz Decl., Exh. 16 (Apple (*Adasam*) RFA Responses ¶

16  56), Exh. 17 (Apple (*Pickwick*) RFA Responses, ¶ 61). The Third Amended

17  Complaint ***specifically alleged that Adasam and Pickwick*** "failed to obtain

18  mechanical licenses or any authorization for the copyrighted compositions

19  embodied on content that they are supplying to [Apple.]" Schwartz Decl., Exh. 15.

20  The Third Amended Complaint also alleged that Pickwick and Adasam were

21  providing pirated recordings for sale on iTunes. *Id.* Despite the notices from major

22  labels and specific allegations made in *Blagman*, Apple continued doing business

23  with Adasam, Pickwick and Genepool.

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████ . *Cook*

27

28

1   *Tr.*, 143-147 (Exh. 21); Schwartz Decl. ¶ 18, Exh. 20, Exh. 3 (highlighted in green).

2   ███████████████████████████████████████ *Cook Tr.*, 147.

3   ██████████████████████████████████████████████

4   ███████████████████████████ *Cook Tr.*, 147:12-148:1. The

5   notice contained 41 recordings at issue in this action against Apple. *Schwartz Decl.,*

6   ¶ 18, Exhs. 3 (highlighted in green), 15.

7        On March 31, 2016, Apple emailed Adasam, "Norman Blagman and his

8   counsel have identified content purported to be In Apple's United States iTunes

9   Store and purported to have been provided by you to Apple without proper

10  authorization or license to exploit the compositions in the sound recordings."

11  Schwartz Decl., Exh. 21. Apple requested that Adasam "confirm in writing to us

12  that Adasam has the requisite rights and authorizations" within 90 days or else

13  Apple would remove the 11,000 recordings identified by Norman Blagman's

14  counsel. Schwartz Decl. Exh. 21. On June 20, 2016 Adasam responded that "I am

15  happy to confirm Adasam has the requisite rights." *Schwartz Decl.*, Exh. 21. ██

16  ████████████████████████████████████████ Cook Tr. p.

17  149:18-150:15.

18  **E.    Independent Labels Confirm Piracy**

19       In addition, Apple received countless notices from smaller, independent

20  labels advising that the tracks delivered by Adasam, Pickwick and Genepool were

21  pirated. For example, in August, 2013, Eric Records notified Apple that Adasam

22  was a pirate. Bill Buster, the President of Eric Records told Apple:

23            It has come to our attention AGAIN (for the THIRD time
             for this particular infringer, Six Week Smile, Adasam) that
24           iTunes is offering our owned-and-controlled Linda Scott
             Masters for download despite the fact that we have LICENSED
25           NO ONE ANY OF THESE VALUALBE MASTERS! . . . I am
             now officially sending you our cease and desist request . . . Note
26           that despite our best efforts in the past to contact Mr.
             Kalidowski, he did not respond. They have attempted THREE
27           times recently to post her songs: June 2012, March 2013 and
             now, August 2013. They clearly know US copyright law and

28

1    you should [not] be aiding and abetting them by continually
     helping them offering our songs.

2    Schwartz Decl., ¶ 26, Exh. 42; *Cook Tr.*, 111-113.

3         This was the third notice Apple had received from Eric Records about

4    Adasam but it was not enough to get Apple to take action. In February, 2018, Apple

5    was again expressly told by Eric Records that Adasam was pirating its Linda Scott

6    catalog:

7         Again, we would like to know Apple/iTunes cannot/will
8    not permanently prevent this particular infringer, Six Week
     Smile, Adasam, aka Steve Kalidoski steve@adasam.co.uk from
9    offering our owned-and-controlled Linda Scott Masters for
     download despite the fact that we have not and will not ever
10   license these masters. [Adasam] uploaded to iTunes multiple
     Linda Scott masters on FOUR separate occasions in the last 4
11   years. . . Not only is it abundantly clear that they are pirating
     pre-1972 music but it is costly for both my company and yours
12   to constantly go through the process of removing their illegal
     posts. Please let me know why they haven't been permanently
13   banned from uploading our material.

14   Schwartz Decl., ¶ 43, Exh. 43.*Cook Tr.*, 113:-03-06; 114:05-10.

15   ███████████████████████████████████████████████

16   ████████████ *Cook Tr.*, 114:18-115:10-17. ████████████

17   ██████████████████████████████████████ *Cook Tr.*,

18   115:18-24. ████████████████████████████████

19   ████████████████████████████████████████████████

20   *Cook Tr.*, 124:15-18; 125:02-07.

21        The same issue was raised time and again by independent record companies

22   and music publishers of pre-1972 recordings. For example, in 2012, Apple received

23   infringement notices from rights owner of the Nina Simone catalog:

24        We have found a large amount of infringements for our
     recording artist Nina Simone and her album "Little Girl Blue."
25   Over 100 albums containing our sound recordings are being sold
     illegally through iTunes. . . [We have] not granted any company
26   permission nor do we have any agreements in place allowing
     any company to copy, digitize or distribute the sound recordings
27   with the exception of one company in Japan . . .Lastly, with
     almost all of these infringements, the labels have used our

28

original album artwork, or have uploaded new artwork and re-arranged the track order and/or renamed the album, perhaps trying to disguise the infringement. Again, these are all illegal as we have not done any deal since our acquisition of [the catalog].

Schwartz Decl., ¶ 28, Exh. 44 (APL-PICK_00008484).

Similarly, in 2014, Apple received a strongly worded takedown notice from the rights of owner of the Connie Francis catalog identifying "incalculable number of infringements" from "151 sources of infringing content" on iTunes. Schwartz Decl., ¶ 29, Exh. 45 (APL-PICK_8622)

**F..    Apple's Own Internal Investigation Confirms Piracy**

. Schwartz Decl., Exhs 46-48.

Schwartz Decl., Exhs 46-48.

Schwartz Decl., Exhs 46-48.

Schwartz Decl., Exhs 46-48.

██████████████████████████████████████████████████████

████████████████████████████████████████████████. Schwartz

Decl., Exhs 46-48.  The list includes iconic recordings by Miles Davis, Frank

Sinatra, Dean Martin, Tony Bennett, Ray Charles, Judy Garland, Billie Holiday,

Ella Fitzgerald, Rosemary Clooney, Tony Bennett, Sarah Vaughan, Nat "King"

Cole.

█████████████████████████████████████████████████████████

███████████████████████████████████████████ Schwartz Decl., Exh. 46

(Apple (*Adasam*) Interrogatory Response # 16); Exh. 47 (Apple (*Pickwick*)

Interrogatory Response # 16); (Apple (*Genepool*) Interrogatory Response # 15██

███████████████████████████████████████ Schwartz Decl., Exh. 46

(Apple (*Adasam*) Interrogatory Response # 16); Exh. 47 (Apple (*Pickwick*)

Interrogatory Response # 16); Exh. 48 (Apple (*Genepool*) Interrogatory Response #

15).

When Adasam's Steve Kalidoski noticed that Apple secretly hid Adasam

tracks, he e-mailed Apple, not to assert that Adasam had rights to these recordings

and dispute Apple's hiding the tracks, but instead to find out what material he

should avoid posting to iTunes going forward so that he would not be "***wasting time***

with further unnecessary uploads that may potentially also be hidden in the future".

Schwartz Decl., ¶ 46, Exh. 49 (emphasis added). Incredibly, Kalidoski's email also

asks Apple how he might go about obtaining rights for the music he was pirating,

"please can you also advise what steps we need to take to get authorization for these

artists?". Schwartz Decl., 46, Exh. 49. Astonishingly, Apple did not sever ties with

Adasam on the spot.

████████████████████████████████████████████████████████



Schwartz Decl., Exh. 46 (Apple (*Adasam*) Interrogatory Response # 13).

**G..     Apple Had No Policy for Terminating Repeat Infringers**

*Cook Tr.,* 124:11-125:7.

Cook Tr., p. 125:20-126:2.

Schwartz Decl., Exhs. 53-55; *Cook Tr.*, p. 100:12-14.[18]

**H..     Apple Knew *Upon Upload* When Recordings Matched Other Recordings Already Available For Sale on iTunes And Failed to Inquire or Notify The Copyright Owners**

*Williamson Tr.*, 26:21-29:21; Schwartz Decl., ¶ 47, Exh. 50. Gracenote had developed a powerful database of audio "fingerprints" and metadata to identify record labels known to have released popular recordings. *Roberts Tr.*, 70:03-75:22.

. *Williamson Tr.*, 28:15-29:21; Roberts Decl., ¶ 2 (Exh. 1 - Roberts Report, p. 10); *Roberts Tr.*, 58:17-59:22; 70:03-75:22. If an audio fingerprint matched a known file, the identity of the unknown recording would be determined. Roberts Decl., ¶ 2 (Exh. 1 - Roberts Report, p. 2-4).

[18] Genepool was terminated in 2019 after Plaintiff SA Music, LLC sued Apple and Genepool in a related case.

1   Gracenote's database and technology are reliable methods to identify rights

2   conflicts and notify competing providers. *Roberts Tr.*, 138:19-139:17; 204:21-

3   206:13; Roberts Decl., ¶ 2 (Exh. 1 - Roberts Report, p. 6). *Marks Tr.*, 127:17-20

4   ("[Gracenote] would be able to identify recordings").

5       In addition to audio fingerprinting technology, Gracenote had the broadest

6   master database of recording information. *Roberts Tr.*, 67:6-8. Gracenote had direct

7   feeds of data from record labels. *Roberts Tr.*, 64:23-24. The database had track

8   information – title of albums, the year of release, detailed genre information, and

9   the label information. *Roberts Tr.*, 68:24-69:03. Gracenote used editors to verify

10  and validate the label information that was received was correct. *Roberts Tr.*,

11  137:21-139:17. By 2005, Gracenote had 150 different licensees – "almost every

12  single company that had music products" – licensed Gracenotes's database,

13  including Apple. *Roberts Tr.*, 67:13-18. Gracenote is the database that powers not

14  only the iPod, but the identification of a song on a car radio and its licensees

15  included, Mercedes, Toyota, Ford, General Motors. *Roberts Tr.*, 67:22-68:04:

16  *Marks Tr.*, 27:22-24 ("[Gracenote] had data that could be sent alongside a song that

17  was being performed on [a car] radio, for example.)".

18      When the label information Gracenote received for a recording conflicted

19  with an entry for a major label in its database, Gracenote's editors would investigate

20  the accuracy of the information and resolve the conflict. *Roberts Tr.*138:03-139:17;

21  151:10-16 (conflicts with major label content are "highly suspicious."). Any

22  conflicts in the data needed to be resolved and could not be ignored by Gracenote.

23  *Roberts Tr.*, 140:5-10. "This is common sense." *Roberts Tr.*, 140:18. Gracenote's

24  data contains label information that could be used solve conflicts by anybody who

25  has access to Gracenote's data (including Apple). *Roberts Tr.*, 143:5-12.

26      Incredibly, instead of using Gracenote's technology for its intended use

27  (identifying rights ownership of recordings), Apple used Gracenote's technology to

28

1  upload files (including infringing files!) to the iTunes store faster by auto-filling

2  Gracenote's data fields such as artist, title and length. Roberts Decl., ¶ 2 (Exh. 1 –

3  Roberts Report p. 10; *Roberts Tr.*, 266:19-269:4; Schwartz Decl., Exh. 50. ██████

4  ████████████████████████████████████████████████████████████████████

5  ██████████████████████████  *Williamson Tr.*, 31:6-10.

6       In addition, beginning in 2011, Apple employed the iTunes Match

7  technology. As explained by Steve Jobs;

8       There's one more thing, small thing, it pertains to iTunes in the
cloud. As you recall, iTunes in the cloud is just for the music that

9  you've purchased from the iTunes Store. Now at 14 billion songs, 15
billion excuse me, that's a lot of songs out there, they've been

10  purchased from iTunes Music Store, but you may have some that you
ripped yourself and there's three ways you can deal with that. One, you

11  can sync your new devices over Wi-Fi or cable, cable. And you only
have to sync them once just to get that music on them and then you can

12  rely on iCloud to take care of getting all your new purchases off iTunes
onto that device; or if it's just a few songs you love you don't wanna

13  leave behind, you can buy those songs that you'll miss on iTunes ,we're
gonna offer a third way which is called iTunes Match. What is iTunes

14  Match? ***Well iTunes Match uses the fact that we've got 18 million
songs now in the iTunes Music Store and the chances are awfully***

15  ***good that we've got the songs in our store that you've ripped. And so,
we wrote software to scan those CDs, the rip scene on iTunes music***

16  ***and match it up with those songs we have in the store.*** Right? and so
we can give that music the same benefits as music purchase from

17  iTunes and it takes just minutes, not weeks. If you have to upload your
whole library into some locker in the sky, that literally takes weeks!

18  This takes minutes, because we're scanning and matching your library,
so we don't need to upload that that large part of your library and the

19  few songs that remain, well we'll upload them. ***But with 18 million
songs we're most likely to have what you've got***. In addition, iTunes

20  Match will upgrade those songs that match the 256 kilobits AAC. And
iTunes Match cost just $24.99 a year, so if you've got a bunch of

21  music, if you've got a bunch of music that you didn't buy from iTunes,
you can get all the benefits of the cloud service and more in terms of

22  upgrading your music for $24.99 a year.

23  Schwartz Decl., Exh. 50 (beginning at 1:51:54)(emphasis added).

24       Whether by Gracenote or iTunes Match , Apple *knew* whether a track

25  provided by Adasam, Pickwick and Genepool matched a major label recording in

26  Gracenote's database. Roberts Decl., ¶ 2 (Exh. 1 – Roberts Report, p. 10-11). At

27  this point, Apple could have notified both labels of the conflict and sought to

28

1  confirm that Adasam, Pickwick or Genepool had rights. *Roberts Decl.*, ¶ 2 (Exh. 1

2  – Roberts Report, p. 11). ███████████████████████████████████

3  ██████████████████████████████████████████████████████████

4  ██████████████████████████████████████████████████████████

5  ███     *Williamson Tr.*, 31:5-32:6; *Roberts Decl.*, ¶ 2 (Roberts Report, p. 10).[19]-[20]

6  Because Gracenote automatically filled in the label field when a recording matched

7  an entry in its database, Adasam, Pickwick and Genepool **had to delete the auto-**

8  **filled label info provided by Gracenote and added their own name in order to**

9  **submit it to Apple for sale on iTunes.** *Roberts Tr.*, 266:19-269:4.

10  ██████████████████████████████████████████████████████████

11  ██████████████████████████████████████████████████████████

12  *Williamson Tr.*, 133:6-133:11. ████████████████████████████████

13  *Williamson Tr.*, 132:7. Of course, *the reason* to notify the content providers is to

14  avoid copyright infringement and ensure that all recordings sold on iTunes are fully

15  licensed. *Kohn Tr.*, 224:24-225:02 ("Apple appears to have built a system to look

16  the other way on purpose. . . The system is designed to look the other way.)"

17  ██████████████████████████████████████████████████████████

18  ████████████████████████████████████   *Williamson Tr.*, 132:17-

19  18, is just an admission of willful blindness. Apple undertook no effort to find out if

20  the bootleg recordings were licensed and Apple's decision to not sort out known

21  [19] ███████████████████████████████████████

22  ██████████████████████████████████████ *Williamson*

23  *Tr.*, p. 27:5-9. ████████████████████████████████████

24  *Williamson Tr.*, p. 26:24-27:2. ███████████████ *Williamson Tr.*,
    26:24-27:2

25  [20] ████████████████████████████████████████████

26  ████████████████████████████████████████████████████████

27  ████████████████████████   *Williamson Tr.*, 128:1-
    129:9.

28

1  conflicts before sale cemented its adoption of an infringe-first, takedown-later,

2  policy. *Kohn Tr.*, p. 217:18-218:01.

3      Further, two different labels legitimately selling the same recording is

4  "extreme[ly] unusual" in the digital music context and rarely occurs outside of

5  movie soundtrack albums. *Kohn Tr.*, 271:8-10. Universal wouldn't license another

6  record company to sell the same Ella Fitzgerald track, "because that would compete

7  against the Ella Fitzgerald track on the album that Universal would be offering

8  through Apple." *Kohn Tr.*, 272 4-13. Likewise, a major label licensing another copy

9  of a complete album "would probably never be done." *Roberts Tr.*, 207:19-23.

10  None of this infringing activity concerned Apple. ██████████████████

11  ██████████████████████████████████████ *Cook Tr.*,

12  135:06 – 136:09.

13                    **Conclusion on Willfulness**

14      Apple's conduct is plainly willful. Apple cannot refute any of the evidence of

15  willfulness because there is no reasonable basis for Apple to believe in the

16  innocence of its conduct. *Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332

17  (9th Cir. 1990)(citing 3 M. Nimmer & D. Nimmer, Nimmer on Copyright §

18  14.04[B], at 14-40.3 (1989).

19      First, sold exact copies of monumental recordings in American music history.

20  *Lanard Toys Limited v. Novelty, Inc.*, 2010 WL 1452527 (9th Cir. 2010)("exactitude

21  of the copying supports willful infringement."). Apple was specifically told by

22  reliable sources that it was selling unauthorized copies from these providers, but

23  Apple never asked them whether, or how, they had acquired rights they purported to

24  have. *Unicolors, Inc.*, 853 F.3d at 991-992,(failure to make any "attempt to check or

25  inquire into" the copyright status of a work when it "has a general awareness" that it

26  might be unauthorized is evidence of willfulness.) **Further, Apple knew it was**

27  **receiving "equivalent" recordings but did not notify any providers of the same**

28

1  **recording when this occurred to confirm a license or resolve a conflict. Roberts**

2  **Tr., 140:18 (this is "common sense.").**

3       Worse, Apple had already been a defendant in the 2012 Blagman copyright

4  infringement action that generally alleged Apple sold pirated pre-72 recordings

5  from many labels, and which ***specifically alleged that Adasam and Pickwick were***

6  ***pirates that never obtained licenses for the musical works they sold on iTunes***.

7  *Lanard Toys Limited v. Novelty, Inc.*, 2008 WL 11333941, *7 (C.D.Cal. 2008)(the

8  existence of prior litigation involving a claim of copyright infringement can be

9  considered). Still worse, Apple sent fraudulent compulsory license notices with

10  fabricated dates of expected initial distribution to Plaintiffs' to conceal Apple's

11  unauthorized copying and unlicensed sales. *Lanard Toys Ltd. V. Novelty, Inc.*, 2010

12  WL 1452527, *711 (9th Cir. 2010)(attempting to conceal blatant copying is

13  evidence of willfulness). This went on for over ten years. *Microsoft Corporation v.*

14  *Buy Cheap Software, Inc.*, 2016 WL 7444627 (C.D.Cal 2016)(length of time of

15  infringing conduct relevant to willfulness).

16       Finally, any claim that Apple reasonably believed Adasam, Pickwick and

17  Genepool's claims that they had rights to these recordings (Sinatra, Ella Fitzgerald,

18  Louis Armstrong, Lena Horne) defies "common sense." *Kohn Tr.*, 223:10-22.

19  Apple performed no due diligence concerning Adasam, Pickwick or Genepool

20  before allowing them into iTunes and had no basis for reasonably believing these

21  foreign labels had rights to the catalogs of Frank Sinatra, Louis Armstrong, and Ella

22  Fitzgerald. At the time of upload, Adasam, Pickwick and Genepool **would have**

23  **had to type over verified label information matched by Gracenote and add**

24  **their own label name in order to submit it to Apple for sale on iTunes.** *Roberts*

25  *Tr.*, 266:19-269:4.

26       Moreover, Apple manually removed 65,000 tracks from the Adasam,

27  Pickwick and Genepool iTunes catalogs after it determined they were not the

28

1  "allowed" label for certain recording artists, yet Apple never stopped doing

2  business with them until they were sued in this case. ██████████████

3  ████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████

5  ████████████████████████████  *Cook Tr.*, 115:18-24. "This is not a[n]

6  ambiguous case. This is very clear cut." *Kohn Tr.*, 257:20-21.

## Conclusion

8  For all of the above reasons, Plaintiffs respectfully ask that the Court grant

9  Plaintiffs' motion for summary judgment on the issues of: (i) Plaintiffs' ownership

10  of valid copyrights in the relevant works; (ii) Apple's infringement of Plaintiffs'

11  copyrights; and (iii) Apple's willfulness; and that the Court direct a trial solely on

12  the issue of damages

13  Dated:        New York, New York
                 November 24, 2021

15                          SCHWARTZ, PONTERIO & LEVENSON, PLLC

16             By:        /s/
                          Matthew F. Schwartz * *Pro Hac Vice*
17                        Brian S. Levenson * *Pro Hac Vice*
                          134 West 29th Street, Suite 1001
18                        New York, New York 10001
                          Phone: (212) 714-1200
19                        E-mail: mschwartz@splaw.us
                          E-mail: blevenson@splaw.us

20                        GISKAN SOLOTAROFF & ANDERSON LLP
                          Oren S. Giskan * *Pro Hac Vice*
21                        90 Broad Street, 10th Floor
                          New York, New York 10004
22                        Telephone: (212) 847-8315
                          E-mail: ogiskan@gslawny.com

Allen Hyman (California State Bar No. 73371)
LAW OFFICES OF ALLEN HYMAN
10737 Riverside Drive
North Hollywood, CA 91602
Phone: (818) 763-6289
E-mail: lawoffah@aol.com

*Attorneys for Plaintiffs*